**ORAL ARGUMENT NOT YET SCHEDULED**

**26-5234**

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

BLOCK CLUB CHICAGO,

*Plaintiff/Appellant*,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et. al.*

*Defendants/Appellees*.

---

On Appeal from the United States District Court
For the District of Columbia
(No. 1-25-cv-01335, Honorable Tanya S. Chutkan)

---

# APPELLANT'S BRIEF

---


Matthew Topic
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
Phone: (312) 243-5900
Email: matt@loevy.com

Stephen Stich Match
LOEVY & LOEVY
222 Sutter Street, Suite 600A
San Francisco, CA 94108
Phone: (312) 243-5900
Email: match@loevy.com

*Attorneys for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to D.C. Circuit Rule 26.1(a)(1)(A), the undersigned certifies that Appellant is 501(c)(3) nonprofit news organization. It has no parent company, and no publicly held company owns 10% or more of its stock.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### I. Parties and *Amici*

Plaintiff-Appellant is Block Club Chicago.

Defendants-Appellees are the United States Department of Homeland Security and United States Immigration and Customs Enforcement.

There were no intervenors or *amici curiae* in the district court, and as of the date of this Certificate, there are none in this Court.

### II. Rulings Under Review

Appellant seeks review of the April 23, 2026, Order of the United States District Court for the District of Columbia (Hon. Tanya Chutkan, J.) in *Block Club Chicago v. Department of Homeland Security,* Case No. 25-cv-1335, granting Defendants' Motion for Summary Judgment and denying Plaintiff's Cross-Motion for Summary Judgment, and the accompanying Memorandum Opinion. The district court's opinion is not published but is available at 2026 WL 1098411.

### III. Related Cases

Appellant is aware of no related cases.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..... i

TABLE OF CONTENTS ..... ii

TABLE OF AUTHORITIES ..... iv

GLOSSARY ..... x

I. JURISDICTIONAL STATEMENT ..... 1

II. ISSUES PRESENTED ..... 1

III. RELEVANT STATUTES ..... 1

IV. INTRODUCTION ..... 2

V. STATEMENT OF THE CASE ..... 3

A. Factual background ..... 3

1. The government claims to focus its immigration enforcement on "violent criminal illegal aliens." ..... 3

2. Arrestees and detainees work with journalists to shed light on conditions of confinement and family separation, which influences federal lawmakers ..... 6

B. Procedural history ..... 10

VI. SUMMARY OF ARGUMENT ..... 14

VII. STANDARD OF REVIEW ..... 16

VIII. ARGUMENT ..... 16

A. The district court misapplied the Exemption 7(C) balancing test by requiring Block Club to supply compelling evidence of illegal government activity ..... 16

1. Exemption 7(C) involves balancing the public and private interests ..... 16

**2. *SafeCard* limited the public interests that can justify releasing names in law enforcement files and imposed a strict evidentiary burden on requesters .......... 18**

**3. *Favish* allows more public interests and recognizes a lesser evidentiary burden .......... 19**

**4. *Favish* abrogates *SafeCard* .......... 21**

**B. The district court overstated the arrestees' and detainees' privacy interests .......... 26**

**1. The interest in obscuring one's arrest or detention is cognizable but not "overwhelming." .......... 26**

**2. The district court failed to consider the potential benefits of disclosure to arrestees and detainees .......... 30**

**C. The district court understated how the records would advance the public interests in disclosure .......... 32**

**1. The records would advance the public's interest in testing the veracity of the government's claims that its immigration efforts focus on "violent criminal illegal aliens." .......... 33**

**2. The records would advance the public's interests in overseeing the government's exercise of discretion in its arrest and detention practices .......... 36**

**D. The public interests prevail .......... 38**

**IX. CONCLUSION .......... 41**

**CERTIFICATE OF COMPLIANCE WITH RULE 32(g) .......... 43**

**CERTIFICATE OF SERVICE .......... 43**

## TABLE OF AUTHORITIES

***Page***

***Cases***

*ACLU v. DOJ*, 655 F.3d 1 (D.C. Cir. 2011) ..............................................17, 26, 33

*Am. Fed'n of Gov't Emps., AFL-CIO v. HUD*, 118 F.3d 786 (D.C. Cir. 1997) ......40

*Bartko v. DOJ*, 898 F.3d 51 (D.C. Cir. 2018).........................................................21

*Cabezas v. FBI*, 109 F.4th 596 (D.C. Cir. 2024) ....................................................24

*Center for National Security Studies v. DOJ*, 331 F.3d 918 (D.C. Cir. 2003) ........40

*Church of Scientology Int'l v. DOJ*, 30 F.3d 224 (1st Cir. 1994)......................23, 25

*Citizens for Resp. & Ethics in Washington v. DOJ*, 746 F.3d 1082 (D.C. Cir. 2014) ........................................................................................18, 25, 37

*Citizens for Resp. & Ethics in Washington v. DOJ*, 854 F.3d 675 (D.C. Cir. 2017) ......................................................................................................25

*Dep't of Def. v. FLRA*, 510 U.S. 487 (1994) .........................................................37

*DOJ v. Reps. Comm. For Freedom of Press*, 489 U.S. 749 (1989) ............16, 17, 26

*Hengel v. City of Pine Bluff*, 821 S.W.2d 761 (Ark. 1991) ....................................28

*Hettena v. CIA*, 145 F.4th 1354 (D.C. Cir. 2025)..................................................16

*Houston Chron. Pub. Co. v. City of Houston*, 531 S.W.2d 177 (Tex. Civ. App. 1975) ...........................................................................................28

*Knowles v. U.S. Dep't of State*, 773 F. App'x 3 (D.C. Cir. 2019).....................24, 25

*Lepelletier v. FDIC*, 164 F.3d 37 (D.C. Cir. 1999) ...............................................30

*Marino v. DEA*, 15 F. Supp. 3d 141 (D.D.C. 2014) ...............................................26

*Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157 (2004) ........ 17, 19, 20, 22, 24, 27, 29, 34

*Newspapers, Inc. v. Breier*, 279 N.W.2d 179 (Wisc. 1979) ........ 28

*Roth v. DOJ*, 642 F.3d 1161 (D.C. Cir. 2011) ........ 16

*SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197 (D.C. Cir. 1991) ........ 12, 17, 18, 19, 21, 22, 24

*State ex rel. Outlet Commc'ns, Inc. v. Lancaster Police Dep't*, 528 N.E.2d 175 (Ohio 1988) ........ 28

*Stern v. FBI*, 737 F.2d 84 (D.C. Cir. 1984) ........ 41

*Union Leader Corp. v. DHS*, 749 F.3d 45 (1st Cir. 2014) ........ 23, 39

*Washington Post Co. v. HHS*, 690 F.2d 252 (D.C. Cir. 1982) ........ 31

***Statutes***

1 V.S.A. § 317(b)(5)(B) ........ 28

5 Ill. Comp. Stat. 140/2.15 ........ 27

5 U.S.C. § 522(a)(4)(B) ........ 1, 16

5 U.S.C. § 552(a)(6)(A)(i) ........ 10

5 U.S.C. § 552(b)(7) ........ 16

5 U.S.C. § 552(b)(7)(C) ........ 1

8 U.S.C. § 1227(a)(2)(A) ........ 5

10 ILCS 5/1A-25(b) ........ 12, 35

18 Pa.C.S. § 9102 ........ 27

28 U.S.C. § 1291 ........ 1

51 O.S. § 24A.8.A........................................................................................27

65 Pa.S. § 67.708(b)(16)...................................................................................27

Cal. Gov. Code § 7923.610...............................................................................27

Colo. Rev. Stat. §§ 24-72-302(7), 24-72-303(1)..................................................27

Conn. Gen. Stat. §1-210(b)(3)...........................................................................27

D.C. Code Ann. §§ 5-113.01(a)(4), 5-113.06(a)....................................................27

Fla. Stat. §§ 119.011(3)(c), 119.071(c)(1)............................................................27

Idaho Code § 74-124(3)(b)................................................................................27

Ind. Code § 5-14-3-5(a)....................................................................................27

Iowa Code § 22.7(9)..........................................................................................27

K.S.A. 45-217(e)(2)...........................................................................................27

La. Rev. Stat. Ann. § 44:3(A)(4); 16 M.R.S.A. § 706...........................................27

Minn. Stat. § 13.82, subd. 2...............................................................................27

Miss. Code §§ 25-61-3(e), 25-61-12(c)................................................................27

Mo. Rev. Stat. § 610.100.2(1); N.H. R.S.A. § 594:14-a.........................................27

N.C.G.S. § 132-1.4(c).......................................................................................27

N.D.C.C. § 44-04-18.7(2)..................................................................................27

N.H. R.S.A. § 594:14-a......................................................................................27

N.J.S.A. 47:1A-3(b)..........................................................................................27

O.C.G.A. 50-18-72(a)(4)...................................................................................27

O.R.S. 192.345(3) ....................................................................................27

R.I. Gen. Laws § 38-2-2(4)(D) ......................................................................27

Utah Code §§ 63G-2-103(16)(b), 63G-2-301(3)(g) ............................................27

Va. Code Ann. § 2.2-3706.A ..........................................................................28

***Other Authorities***

Adrian Florido, NPR fact checks Kristi Noem on ICE detaining US citizens, *NPR*, 2 (Nov. 5, 2025), https://docs.house.gov/meetings/JU/JU10/20251119/118665/HHRG-119-JU10-20251119-SD006-U6.pdf..................................................................5, 34

Arrested: Worst of the Worse, *Department of Homeland Security*, https://www.dhs.gov/wow?page=0 ..........................................................................29

Claire Healy et al, 'Some cry all day.' ICE detainees face harsh conditions in Miami federal facility, *Miami Herald* (updated Jan. 12, 2026), https://www.miamiherald.com/news/local/immigration/article308076975.html.......6

Detention Management, *U.S. Immigration and Customs Enforcement*, https://www.ice.gov/detain/detention-management.........................................................4

Ethan Weinstein, The feds are increasingly relying on Vermont's prisons for immigration detention, *VTDigger* (Apr. 3, 2025), https://vtdigger.org/2025/04/03/the-feds-are-increasingly-relying-on-vermonts-prisons-for-immigration-detention/ .........................................................7

Ginger Thompson, Listen to Children Who've Just Been Separated From Their Parents at the Border, *ProPublica* (June 18, 2018), https://www.propublica.org/article/children-separated-from-parents-border-patrol-cbp-trump-immigration-policy.........................................................9

H.R. 6397, 119th Cong. § 2 (2025) ......................................................................8

H.R.8494, 119th Cong. § 1(a)(2) (2026) ..................................................................9

ICE continues to remove 'Worst of the Worst' throughout June, *U.S. Immigration and Customs Enforcement* (June 22, 2026),

https://www.ice.gov/news/releases/ice-continues-remove-worst-worst-throughout-june ....................4

Kan. Att'y Gen. Op. 1987-25, https://ksag.washburnlaw.edu/opinions/1987/1987-025.pdf ....................27

Laura Villagran, Immigrant women describe 'hell on earth' in ICE detention, *USA TODAY* (Mar. 23, 2025), https://www.usatoday.com/story/news/nation/2025/03/23/immigrant-women-hell-on-earth-trump-ice-detention/82029368007/ ....................7

Letter from Senator Andy Kim, et al., to Secretary of Homeland Security Markwayne Mullin (May 29, 2026), https://www.kim.senate.gov/wp-content/uploads/2026/05/Quill-Letter-L37114-Delaney-Hall-Oversight-Letter-FINAL-Version-4-05-29-2026-@-02-26-PM.pdf ....................8

Making America Safe Again, *Department of Homeland Security*, https://www.dhs.gov/making-america-safe-again ....................4

Nicole Foy, We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days, *ProPublica* (Oct. 16, 2025), https://www.propublica.org/article/immigration-dhs-american-citizens-arrested-detained-against-will ....................5

Police Blotter Information, OIP Op. Ltr. No. 07-04 (Mar. 22, 2007) https://ags.hawaii.gov/oip/wp-content/blogs.dir/11/files/2007/03/0322-OIP-Op.-Ltr.-No.-07-04-KPD-re-Police-Blotter-Information-U-RFO-G-07-44.pdf......28

Restatement (Second) of Torts, § 652(D) ....................31

Restatement (Second) of Torts, § 652D, cmt. G ....................29

Restoring Order: ICE Arrests Illegal Alien with 40 Criminal Convictions, *U.S. Immigration and Customs Enforcement* (July 15, 2025), https://www.dhs.gov/news/2025/07/15/restoring-order-ice-arrests-illegal-alien-40-criminal-convictions ....................3

Senator Andy Kim, Senator Kim Leads NJ Democratic Delegation in Demanding an End to ICE Brutality and Inhumane Detention at Delaney Hall (May 29, 2026), https://www.kim.senate.gov/press_release/senator-kim-leads-

nj-democratic-delegation-in-demanding-an-end-to-ice-brutality-and-inhumane-detention-at-delaney-hall/ ........ 8

Senator John Ossoff, Medical Neglect & Denial of Adequate Food or Water in U.S. Immigration Detention, 6-6 & nn. 6, 9 (Oct. 2025), https://www.ossoff.senate.gov/wp-content/uploads/2025/10/25.10.24_Sen.-Ossoff-Medical-Neglect-Denial-of-Adequate-Food-or-Water-in-U.S.-Immigration-Detention.pdf ........ 7

Senator John Ossoff, The Abuse of Pregnant Women & Children in U.S. Immigration Detention, 4-5 & nn.4, 5 (July 30, 2025), https://www.ossoff.senate.gov/wp-content/uploads/2025/08/250721_Pregnancy_Report_v7.pdf........ 6

Sophie Nieto-Munoz, Newark migrant jail detainees launch hunger, labor strike over conditions behind bars, *New Jersey Monitor* (May 22, 2026), https://newjerseymonitor.com/2026/05/22/delaney-hall-hunger-strike/ ........ 8

Statement by US Immigration and Customs Enforcement, *U.S. Immigration and Customs Enforcement* (Jan. 26, 2025), https://www.ice.gov/news/releases/statement-us-immigration-and-customs-enforcement ........ 3

The Press Highlighted Harms from Family Separation and Played a Key Role in the Government's Response, *American Immigration Council* (Oct. 30, 2025), https://www.americanimmigrationcouncil.org/report-page/press-highlighted-harms-family-separation/ ........ 9

Yiqing Wang, He Wanted to Record a TikTok, But Ended up in Immigration Detention, *Voice of San Diego*, June 17, 2025), https://voiceofsandiego.org/2025/06/17/he-wanted-to-record-a-tiktok-but-ended-up-in-immigration-detention/........ 7

## GLOSSARY

| | |
|---|---|
| DHS | Department of Homeland Security |
| ICE | U.S. Immigration and Customs Enforcement |

# I. JURISDICTIONAL STATEMENT

This case was brought under the Freedom of Information Act, 5 U.S.C. § 552(a)(4)(B), and presents a federal question conferring jurisdiction on the District Court. Venue was proper under 5 U.S.C. § 522(a)(4)(B).

This Court has jurisdiction to review this appeal pursuant to 28 U.S.C. § 1291. This appeal is taken from a final judgment entered by the United States District Court for the District of Columbia on April 23, 2026. J.A.55. Appellant filed a timely notice of appeal on June 22, 2026. J.A.56.

# II. ISSUES PRESENTED

Whether Appellees properly withheld, under FOIA Exemption 7(C), the names of individuals arrested or detained by ICE during the Chicago immigration raids in early 2025, notwithstanding that this information is routinely made public, including by ICE, and that disclosure would advance the public's interest in assessing ICE's claim that it focused its enforcement efforts on "violent criminal illegal aliens," as well as its interest in overseeing the conditions of confinement.

# III. RELEVANT STATUTES

"This section does not apply to matters that are … records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information … could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).

## IV. INTRODUCTION

Arrest and detention by Immigration and Customs Enforcement is one of the most consequential and controversial issues in America. Critical questions span multiple dimensions. To what extent has the government kept its promise that immigration enforcement would focus on violent criminals? How often has ICE picked up U.S. citizens? And how has it chosen to treat those it arrests and detains? More fundamentally, it is a foundational principle in a free society that the public should be informed of who its government is arresting, and why.

Appellant Block Club Chicago, a non-profit news organization, submitted a FOIA request to help answer these questions for a finite but important slice of the government's enforcement activities: the Chicago immigration crackdown during the first ten days of the current administration. ICE produced spreadsheets that contain some information about the arrestees and detainees, such as their nationality and the status of their immigration case. But, citing FOIA's privacy exemptions, ICE redacted their names. The propriety of those redactions is the subject of this appeal.

Under prevailing law, the court must balance the public interests in disclosure with the arrestees' and detainees' privacy. Interests exist on both sides of the ledger, as the district court held. But the district court undervalued the records' contribution to public interests that (in its words) are "significant and compelling." It overstated

the privacy interests at stake as "overwhelming"; this information is routinely published in most states and by ICE itself. And it wrongly required Appellants to prove *ex ante* that the records contain compelling evidence of illegal government activity. A proper balancing of the interests favors disclosure. This Court should reverse.

## V. STATEMENT OF THE CASE

### A. Factual background.

#### 1. The government claims to focus its immigration enforcement on "violent criminal illegal aliens."

In January of 2025, ICE announced, and began conducting, "enhanced targeted operations" in Chicago to "keep[] potentially dangerous criminal aliens out of our communities."[1] Since then, the agency and its parent, the Department of Homeland Security, have repeatedly emphasized that their enforcement efforts prioritize dangerous criminals, claiming that ICE's "ongoing effort" is "to identify and remove the worst of the worst threatening our public safety and exploiting America's immigration system,"[2] that "ICE protects the American public by

---

[1] Statement by US Immigration and Customs Enforcement, *U.S. Immigration and Customs Enforcement* (Jan. 26, 2025), https://www.ice.gov/news/releases/statement-us-immigration-and-customs-enforcement.

[2] Restoring Order: ICE Arrests Illegal Alien with 40 Criminal Convictions, *U.S. Immigration and Customs Enforcement* (July 15, 2025), https://www.dhs.gov/news/2025/07/15/restoring-order-ice-arrests-illegal-alien-40-criminal-convictions.

removing as many dangerous and violent criminals as we possibly can,"[3] and that "the hardworking men and women of the department are fulfilling President Trump's promise to Make America Safe Again by removing violent criminal illegal aliens."[4]

But data published by ICE casts doubt on the veracity of the government's claims and also raises more questions. For instance, in Fiscal Year 2025, ICE booked a total of 310,181 individuals broken into three "criminality" categories: Convicted Criminal, Pending Criminal Charges, and Other Immigration Violator. The largest number of detentions fell into the third category, which is not premised on any criminal violation. Only about a third of detainees were convicted criminals.[5]

It is unclear from this data, however, how many of these convicted or charged individuals are "dangerous and violent": the government's claimed targets. The data simply report whether the individual had a criminal charge or conviction of any kind. And according to ICE's definitions, "criminal" is not limited to serious crimes that

---

[3] ICE continues to remove 'Worst of the Worst' throughout June, *U.S. Immigration and Customs Enforcement* (June 22, 2026), https://www.ice.gov/news/releases/ice-continues-remove-worst-worst-throughout-june.

[4] Making America Safe Again, *Department of Homeland Security*, https://www.dhs.gov/making-america-safe-again.

[5] *See* Detention Management, *U.S. Immigration and Customs Enforcement*, https://www.ice.gov/detain/detention-management. As of the date of this filing, these statistics can be found by scrolling to the bottom of the webpage, clicking "FY 2025 ICE Statistics," downloading the spreadsheet, and navigating to the "Detention FY25" cell. The results are in Row 29.

subject a noncitizen to removal, such as aggravated felonies or crimes of moral turpitude. *See* 8 U.S.C. § 1227(a)(2)(A). It instead applies to all "Immigration Violators with a criminal conviction" or "pending criminal charges entered into ICE system of records at the time of ICE custody."[6] So the published data do not distinguish between marijuana users versus murderers, or speeders versus sex traffickers.

In addition, ICE's stated immigration priorities, for obvious reasons, do not include arresting and detaining U.S. citizens—the stated focus is on "aliens." And indeed, the prior Secretary of Homeland Security stated unambiguously that "no American citizens have been arrested or detained."[7] Yet public reporting has cast doubt on that proposition too. One *ProPublica* study found "more than 170" instances of citizens being arrested and detained by immigration authorities in the first nine months of the current administration.[8] Because the government does not

[6] *See id.*, Footnotes Sheet, Row 52.
[7] Adrian Florido, NPR fact checks Kristi Noem on ICE detaining US citizens, *NPR*, 2 (Nov. 5, 2025), https://docs.house.gov/meetings/JU/JU10/20251119/118665/HHRG-119-JU10-20251119-SD006-U6.pdf.
[8] Nicole Foy, We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days, *ProPublica* (Oct. 16, 2025), https://www.propublica.org/article/immigration-dhs-american-citizens-arrested-detained-against-will.

publish the data, the study's author found that this number is "almost certainly incomplete."[9]

### 2. Arrestees and detainees work with journalists to shed light on conditions of confinement and family separation, which influences federal lawmakers.

The public is not concerned just with who the government arrests and detains, but also how it chooses to treat those it does. The issue has gripped the attention of lawmakers, who have published numerous studies on conditions of confinement. Those studies often rely on reports by the press that are based on interviews with current and former ICE arrestees and detainees.

One congressional study relied on reporting from the *Miami Herald* and *VTDigger*.[10] The *Miami Herald* story resulted from interviews with "more than a dozen immigrant detainees," some of whom related an incident in which approximately fifty men were kept in a holding cell with a single toilet and no medical care, where one man was "coughing up blood," and into which "officers launched flash-bang grenades."[11] In the *VTDigger* report, a current detainee stated

---

[9] *Id.*

[10] *See* Senator John Ossoff, The Abuse of Pregnant Women & Children in U.S. Immigration Detention, 4-5 & nn.4, 5 (July 30, 2025), https://www.ossoff.senate.gov/wp-content/uploads/2025/08/250721_Pregnancy_Report_v7.pdf.

[11] Claire Healy et al, 'Some cry all day.' ICE detainees face harsh conditions in Miami federal facility, *Miami Herald* (updated Jan. 12, 2026), https://www.miamiherald.com/news/local/immigration/article308076975.html.

on the record that "the majority of immigration detainees aren't able to access prison phones and struggle to receive medical care."[12]

A second congressional study relied on further news reporting, again based on interviews with detainees.[13] In one report from *USA TODAY*, detainees described being held on prison buses for up to twelve hours, chained and shackled and "unable to breathe properly," with guards telling them to "urinate or defecate on the floor," which some were forced to do.[14] This study also cited a story from *Voice of San Diego* about a green card holder who was wrongfully arrested and detained for suspected human trafficking that he did not commit. During his detention, which included a week of solitary confinement, he claimed on the record to have "survived on two energy bars and slept on concrete, wrapped in a thin sheet of tinfoil."[15]

---

[12] Ethan Weinstein, The feds are increasingly relying on Vermont's prisons for immigration detention, *VTDigger* (Apr. 3, 2025), https://vtdigger.org/2025/04/03/the-feds-are-increasingly-relying-on-vermonts-prisons-for-immigration-detention/.

[13] *See* Senator John Ossoff, Medical Neglect & Denial of Adequate Food or Water in U.S. Immigration Detention, 6-6 & nn. 6, 9 (Oct. 2025), https://www.ossoff.senate.gov/wp-content/uploads/2025/10/25.10.24_Sen.-Ossoff-Medical-Neglect-Denial-of-Adequate-Food-or-Water-in-U.S.-Immigration-Detention.pdf.

[14] Laura Villagran, Immigrant women describe 'hell on earth' in ICE detention, *USA TODAY* (Mar. 23, 2025), https://www.usatoday.com/story/news/nation/2025/03/23/immigrant-women-hell-on-earth-trump-ice-detention/82029368007/.

[15] Yiqing Wang, He Wanted to Record a TikTok, But Ended up in Immigration Detention, *Voice of San Diego*, June 17, 2025), https://voiceofsandiego.org/2025/06/17/he-wanted-to-record-a-tiktok-but-ended-up-in-immigration-detention/.

Following thirty days of detention, a judge ordered him released after expressing bafflement at the man's apprehension: "Have you ever heard of a human trafficker traveling with his girlfriend and three hamsters?" mused the judge.[16]

More recently, two Senators and eight Members of Congress issued a letter[17] and an accompanying press release[18] on detainee treatment at Delaney Hall, a detention center in New Jersey. The press release cited a story from the *New Jersey Monitor* that reported on a hunger strike undertaken by detainees to protest their conditions. One detainee asserted that "they are taking our freedom of speech, and our physical health is in danger," while others "said they found live worms in their meals of beans and salad."[19]

In addition to investigating confinement conditions, lawmakers have introduced legislation to address it, one with over a hundred cosponsors. *See, e.g.*, H.R. 6397, 119th Cong. § 2 (2025) ("It is the sense of Congress that detention, even

---

[16] *Id.*

[17] Letter from Senator Andy Kim, et al., to Secretary of Homeland Security Markwayne Mullin (May 29, 2026), https://www.kim.senate.gov/wp-content/uploads/2026/05/Quill-Letter-L37114-Delaney-Hall-Oversight-Letter-FINAL-Version-4-05-29-2026-@-02-26-PM.pdf.

[18] Senator Andy Kim, Senator Kim Leads NJ Democratic Delegation in Demanding an End to ICE Brutality and Inhumane Detention at Delaney Hall (May 29, 2026), https://www.kim.senate.gov/press_release/senator-kim-leads-nj-democratic-delegation-in-demanding-an-end-to-ice-brutality-and-inhumane-detention-at-delaney-hall/.

[19] Sophie Nieto-Munoz, Newark migrant jail detainees launch hunger, labor strike over conditions behind bars, *New Jersey Monitor* (May 22, 2026), https://newjerseymonitor.com/2026/05/22/delaney-hall-hunger-strike/.

for a short period of time, inflicts severe, irreparable harm on children and should be avoided."); H.R.8494, 119th Cong. § 1(a)(2) (2026) ("Decades of documentation have proven that, across the immigration detention system, U.S. Immigration and Customs Enforcement subjects people to violations of their basic rights and unconscionable conditions").

One particularly notable aspect of confinement is the practice of family separation. That, too, has resulted in substantial reporting that led to real change. According to the American Immigration Council, for example, "[j]ournalists played a key role in bringing the stories of people affected by family separation to the attention of the public and government officials," and "family separation ended as a categorical practice just two days after *ProPublica* posted audio of crying children in a detention facility."[20] The *ProPublica* audio was taken by a detainee who provided it to journalists through her lawyer.[21]

In each of these cases, journalists relied on information from arrestees and detainees to report news that influenced lawmakers and/or the immigration

---

[20] The Press Highlighted Harms from Family Separation and Played a Key Role in the Government's Response, *American Immigration Council* (Oct. 30, 2025), https://www.americanimmigrationcouncil.org/report-page/press-highlighted-harms-family-separation/.

[21] *See* Ginger Thompson, Listen to Children Who've Just Been Separated From Their Parents at the Border, *ProPublica* (June 18, 2018), https://www.propublica.org/article/children-separated-from-parents-border-patrol-cbp-trump-immigration-policy.

authorities. But arrestees and detainees typically lack the resources and wherewithal to reach out to reporters. J.A.44. And ICE refuses to discuss alleged incidents regarding particular arrestees and detainees unless the reporter first identifies the immigrant involved. *Id.* So knowing their names in advance is often the only way for reporters to tell their stories, which many arrestees and detainees want to be told, and which are central to one of the most important issues in the public consciousness today.

### B. Procedural history.

Appellant Block Club Chicago is a nonprofit local news organization based in Chicago. J.A.43. On January 30, 2025, it submitted a FOIA request to ICE that sought the following:

> Arrest reports or other records sufficient to show all of the arrests and detentions involving ICE personnel from January 21, 2025 through January 30, 2025, in Chicago and/or the Chicago region.
>
> For each arrest, please provide the name and age of the arrestee or detainee; the arrest or detention case number; the date of the action; the address of the action; and the current status of the arrest or case.

J.A.33. Block Club sued after ICE failed to respond to the request within FOIA's 20 business-day deadline. J.A.44; 5 U.S.C. § 552(a)(6)(A)(i).

After Block Club sued, ICE produced two spreadsheets. One pertained to individuals arrested by ICE. The other concerned those detained. ICE released the individual's birth year, the time the individual was booked or apprehended, the

location of the apprehension (apart from home addresses), where the individual was detained, and information about their immigration case, including if the individual has received a final order of removal and his or her departure country (if applicable). Citing Exemption 7(C), ICE redacted the individuals' names, birth dates, home addresses, and case IDs. J.A.37.

Block Club disagreed with the redactions, particularly the names, so the parties cross-moved for summary judgment. Block Club conceded that the detainees and arrestees have cognizable privacy interests in the fact that they were arrested or detained by ICE. But it argued that those interests were not particularly strong, including in light of DHS's own practice of publishing the names and photographs of tens of thousands of people it arrests or detains. Block Club also argued that the privacy interests were further diminished because public reporting has often benefited those arrested or detained by ICE and many have been willing to speak with journalists about their ordeals.

Block Club further argued that the arrestees' and detainees' privacy interests did not outweigh two public interests in disclosure. Block Club's first interest was in assessing the government's claims that its focus was on "violent criminal illegal aliens" and that "no American citizens have been arrested or detained." It argued that the public could do so by comparing ICE's list of those arrested or detained with public information about their criminal history and citizenship status. The latter

includes criminal and voting records, which the public in Illinois can access. *See* 10 ILCS 5/1A-25(b) (providing that "any person may view" the centralized statewide voter registration list on a computer screen at the Springfield Office of the State Board of Elections).

Block Club also asserted a public interest in shedding light on ICE's operations, including conditions of confinement, family separation, and arrest tactics. It argued that detainees' and arrestees' names are necessary to serve that interest because ICE policies render it difficult if not impossible for journalists to contact individuals without first knowing who they are—a classic catch-22.

The district court granted summary judgment to ICE. It held that, under this Court's case law, only one public interest could overcome the arrestees' and detainees' privacy interests: confirming or refuting evidence that the agency "is engaged in illegal activity." J.A.50 (quoting *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir. 1991)). It also held that triggering this interest requires the requester to provide *ex ante* "compelling evidence" of that illegal activity. *Id.* (quoting *SafeCard*, 926 F.2d at 1206). And it held that Block Club failed to present any such evidence. J.A.51-52.

The court proceeded to balance the interests *arguendo*. On the privacy side, it held that individuals have an "overwhelming" interest in keeping secret the fact that ICE arrested or detained them. J.A.51. It declined to recognize a reduced

interest because "while some detainees might welcome compelled disclosure, others would likely not." J.A.53.

On the public interest side, the court acknowledged that Block Club's asserted interests are "significant and compelling." J.A.53. But it found that their incremental value did not justify disclosure. J.A.52. It reached this conclusion in part because not every U.S. citizen is registered to vote, and thus that the redacted records, when combined with publicly available data, would not reveal the full extent to which ICE might have arrested or detained Americans. *Id*. It stated that individuals when interviewed by journalists might not be truthful about their criminal history, without accounting for the fact that that information can be ascertained through public-records searches. *Id*. It also observed that ICE can lawfully detain individuals who have not committed crimes, which, while true, was not responsive to Block Club's asserted interest in assessing ICE's ***claims*** about those whom it arrested and detained. J.A.52-53. And it did not directly engage with Block Club's asserted interest in illuminating specific discretionary aspects of ICE's operations, such as how it chooses to treat those it apprehends and confines.

The district court last compared the private and public interests. Having concluded that Block Club failed to present compelling evidence of illegality, and in light of its conclusions on the strength of the respective interests, the court held

that the scales tilted toward secrecy. J.A.53. It thus upheld ICE's application of Exemption 7(C) and granted the agency summary judgment. J.A.54.

Block Club appealed. J.A.56.

## VI. SUMMARY OF ARGUMENT

1. Exemption 7(C) required the district court to balance the detainees' and arrestees' privacy interests against the public interests in disclosure. The court started from an erroneous premise by holding that Block Club failed to trigger a valid public interest. According to the district court, Block Club was required to, but did not, present compelling evidence that ICE was engaged in illegal activity. That requirement stems from obsolete case law that has been displaced by intervening Supreme Court precedent. Under that precedent, Block Club was merely required to present evidence that would warrant a reasonable belief that government impropriety might have occurred, which Block Club did.

The district court also wrongly balanced the interests at stake.

2. The district court began by overstating the applicable privacy interests. Block Club does not dispute that ICE arrestees and detainees have a cognizable privacy interest that must be balanced against the public interests in disclosure. But that interest is not "overwhelming," as the district court held. Instead, state statutes, ICE's practice, and the common law, all of which inform the privacy analysis, confirm that that interest is not particularly strong. It is further reduced because

disclosure stands to benefit detainees and arrestees given ongoing congressional attention to the issue, as evidenced by the fact that many of them willingly speak to journalists about their ordeals. The preferences of that subgroup are not dispositive of the overall arrestee/detainee population, but they are relevant. ICE failed to account for them, and the district court erred by disregarding them.

3. On the other side of the scale are two significant public interests. The first is in testing the government's claims about who it arrests and detains: to what extent are they "violent criminals," and are they exclusively "aliens"? Given extant public information, these claims are dubious, and the public has a strong interest in understanding if the government has misled it about its immigration priorities and activities. Detainees and arrestees' names, when combined with publicly available data, can answer these questions.

The second public interest is in understanding the government's exercise of discretion on issues such as conditions of confinement. That requires names so that journalists can contact individuals and follow them through the system, as many non-citizens have invited in the recent past.

4. The public interests prevail on the specific facts of this case, as the First Circuit held in a similar matter involving individuals arrested by ICE. The privacy interests are not negligible, but they are not particularly strong, and are outweighed

because the records are necessary for the public to adequately comprehend federal immigration policy—one of the most important issues of our times.

## VII. STANDARD OF REVIEW

The district court was required to review *de novo* the agency's decision to redact the detainees' and arrestees' names. *See* 5 U.S.C. § 552(a)(4)(B). As this appeal arises from a summary judgment decision, this Court reviews the district court's decision *de novo*. *Hettena v. CIA*, 145 F.4th 1354, 1357 (D.C. Cir. 2025).

## VIII. ARGUMENT

### A. The district court misapplied the Exemption 7(C) balancing test by requiring Block Club to supply compelling evidence of illegal government activity.

#### 1. Exemption 7(C) involves balancing the public and private interests.

As with all FOIA's exemptions, agencies asserting Exemption 7(C) bear the burden to prove that it applies. *See DOJ v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 755 (1989). Applying it involves a three-step process.[22] First, the agency must identify a "substantial privacy interest[]" in the records. *Roth v. DOJ*, 642 F.3d 1161, 1174 (D.C. Cir. 2011). Second, if it does, the requester must then identify a "significant" public interest that the records would likely advance. *Id*. The public interest element "focuses on the citizens' right to be informed about what their

[22] A threshold step requires the agency to show that the records were compiled for law enforcement purposes. *See* 5 U.S.C. § 552(b)(7). Block Club does not dispute ICE's showing on this threshold.

government is up to." *Reps. Comm.*, 489 U.S. at 773 (citation omitted). That interest includes not just information within the four corners of the responsive records, but also "potential derivative uses of that information," such as its use to conduct research into government activities. *ACLU v. DOJ*, 655 F.3d 1, 7 (D.C. Cir. 2011). And third, if interests exist on both sides, the court must balance them to determine if the public interest warrants the impact on the privacy interest. *See Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 171 (2004) ("The term 'unwarranted' requires us to balance the [individual's] privacy interest against the public interest in disclosure.").

The district court followed this general procedure. But its analysis flowed from a foundational error. According to the district court, because the redacted information consisted of names in law enforcement files, only one public interest could possibly overcome the individuals' privacy interests: an interest in "confirm[ing] or refut[ing]" that "the agency denying the FOIA request is engaged in illegal activity." J.A.50 (quoting *SafeCard*, 926 F.2d at 1205-06). It also held that to trigger that interest, Block Club must provide, *ex ante*, "compelling evidence" that ICE was breaking the law. *Id.* The district court thus held that Block Club failed to meet the burden it had placed on it. J.A.51-52.

In saddling Block Club with this burden, the district court relied on this Court's decision in *SafeCard*. But it was wrong to do so. For the following reasons,

this aspect of *SafeCard* is no longer good law in light of the Supreme Court's later *Favish* decision.

### 2. ***SafeCard*** **limited the public interests that can justify releasing names in law enforcement files and imposed a strict evidentiary burden on requesters.**

Decided in 1991, *SafeCard* issued the following holding:

> Unless access to the names and addresses of private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure.

*SafeCard*, 926 F.2d at 1206. This rule is "categorical[]," such that it applies whenever a FOIA request seeks names in a law enforcement file. *Id.*[23]

*SafeCard*'s categorical rule has two noteworthy components. One concerns the strength of the public interest that can overcome the privacy interests of people referenced in law enforcement files. The other concerns the FOIA requester's evidentiary burden to trigger that interest.

First, *SafeCard* holds that only one public interest is strong enough to overcome the privacy interests of private individuals named in law enforcement files: confirming or refuting that the agency is engaged in "illegal activity." *SafeCard*, 926 F.2d at 1206. All other interests are too weak under *SafeCard*. For

[23] *SafeCard* does not purport to apply, however, when the FOIA request seeks more than a person's identity. *See Citizens for Resp. & Ethics in Washington v. DOJ*, 746 F.3d 1082, 1094 (D.C. Cir. 2014).

example, a requester may not uncover a third-party name in a law enforcement file to show that an agency lied to the American public about a matter of exceptional national importance—wrongful but not "illegal."

Second, *SafeCard* requires the requester to present very strong *ex ante* evidence to trigger the public interest. The requester must supply "compelling evidence" that the agency is breaking the law. *SafeCard*, 926 F.2d at 1206.

#### 3. ***Favish*** **allows more public interests and recognizes a lesser evidentiary burden.**

After this Court decided *SafeCard*, the Supreme Court issued its decision in *Favish*, which addressed the same issues: the public interests that are sufficient under Exemption 7(C), and the evidentiary burden a requester must meet to trigger those interests.

In *Favish*, the agency invoked Exemption 7(C) over death-scene images of a deputy counsel to the President; investigators had ruled the death a suicide by gunshot. *See Favish*, 541 U.S. at 161. These images, the Court held, implicated extremely strong privacy interests for the deceased's family members, intrusion of which were "long deemed impermissible under the common law and in our cultural traditions." *Id*. at 167. As the Court held, a family's control over a loved one's body has "been respected in almost all civilizations from time immemorial," and interfering with that control "tends to degrade the rites and respect they seek to accord to the deceased person who was once their own." *Id.* at 167, 168. And

surviving family members' privacy interests in death-scene images are especially strong in the non-negligible set of cases where they are requested under FOIA by "child molesters, rapists, murderers, and other violent criminals." *Id*. at 170.

Having articulated this strong privacy interest, *Favish* then identified a public interest sufficient to overcome it and the quantum of evidence a requester must introduce to trigger that interest—the same two issues addressed by *SafeCard*'s categorical rule.

First, according to *Favish*, one sufficiently strong public interest is in "show[ing] that responsible officials acted negligently or otherwise improperly in the performance of their duties." *Favish*, 541 U.S. at 174. That does not require illegality. In the circumstances of *Favish*, it would have been enough for the records to lead to "uncovering deficiencies or misfeasance in the Government's investigation" of the death. *Id*. at 173. While conducting a deficient investigation might be negligent, it is not illegal.

Second, *Favish* held that the requester "must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Favish*, 541 U.S. at 174. In articulating that burden, it rejected a "clear evidence" requirement. *Id*. It did so because enforcing that requirement would conflict with "FOIA's prodisclosure purpose." *Id*. The "belief

by a reasonable person" standard, which it adopted, is "less stringent" and "more faithful to the statutory scheme." *Id.*[24]

#### 4. ***Favish* abrogates *SafeCard*.**

Both aspects of *SafeCard*'s categorical rule are inconsistent with *Favish*, of which *SafeCard* of course lacked the benefit.

First, *Favish* abrogates *SafeCard*'s holding that just one public interest can overcome a person's interest in being named in a law enforcement file: confirming or refuting accusations of government illegality. *SafeCard* reached that conclusion because "[t]he privacy interest at stake is substantial," *SafeCard*, 926 F.2d at 1205, and unless the public interest pertains to government illegality, "there is no reason to believe that the incremental public interest in such information would ever be significant" so as to overcome that interest, *id*. at 1206. And it made clear that this holding applies as a categorical matter to ***every*** third party associated with a law enforcement activity, regardless of the enforcement activity or the person's connection to it. The *SafeCard* rule applies equally to criminal suspects, to key witnesses, to mere bystanders, to individuals (like some ICE arrestees and detainees) associated with administrative infractions rather than crimes. *See id*. at 1205-06; *see also Bartko v. DOJ*, 898 F.3d 51, 64 (D.C. Cir. 2018) (holding that law enforcement

[24] *Favish* did not balance the interests because the requester did not introduce evidence satisfying the lesser "reasonable person" standard. *Id*. at 175.

records include those arising from investigations "which could, if proved, result in civil or criminal sanctions").

In *Favish*, though, the Court held that a different public interest—shedding light on government misconduct short of illegality—can overcome a ***stronger*** privacy interest: preserving a family's control over death-scene images of a loved one. While *Favish* did not expressly compare the strength of that interest vis-à-vis the interest in being named in a law enforcement file, there can be no reasonable dispute that that privacy interest is stronger than those held by at least some individuals named in law enforcement files and thus governed by *SafeCard*'s categorical rule. Surely a greater privacy invasion occurs when the government discloses a death-scene photograph to the victim's killer than when it reveals that a private citizen received a parking ticket, a civil law violation captured by *SafeCard*. And if uncovering government misconduct can sometimes overcome a ***stronger*** privacy interest than some privacy interests implicated by *SafeCard*'s categorical rule, then that categorical rule can no longer stand.

Second, *Favish* displaces *SafeCard*'s rule that a requester must present "compelling evidence" to trigger the relevant public interest. *SafeCard*, 926 F.2d at 1206. *Favish* held that requiring *ex ante* "clear evidence" of a public interest is inconsistent with "FOIA's prodisclosure purpose." *Favish*, 541 U.S. at 174. That holding was a general one untethered to *Favish*'s specific facts, so it applies in

circumstances in which *SafeCard* otherwise would have. If anything, *Favish*'s reasoning applies with greater force to the scenario *SafeCard* contemplates, where the privacy interests of at least some people protected by its categorical rule—such as those who committed minor civil infractions—are far weaker than those of the family members in *Favish*.

Post-*Favish* cases confirm that the *SafeCard* categorical rule is no longer good law.

Cases after *Favish* have applied it rather than *SafeCard* in circumstances where *SafeCard* otherwise would have applied. The most notable is the First Circuit's decision in *Union Leader Corp. v. DHS*, 749 F.3d 45 (1st Cir. 2014), which is closely analogous to this case; prior to *Favish*, the First Circuit had endorsed the *SafeCard* categorical rule. *See Church of Scientology Int'l v. DOJ*, 30 F.3d 224, 238 n.22 (1st Cir. 1994). The *Union Leader* court ordered the government to disclose the names of ICE arrestees over an Exemption 7(C) objection. It held that the arrestees' privacy interest was outweighed by the public interest in understanding why ICE was delaying in deporting non-citizens who had been ordered removed. *See Union Leader*, 749 F.3d at 56. It characterized that delay as "negligence," not illegal conduct, and held that while the requester had not presented "conclusive evidence of negligence," its evidence was "enough to warrant a reasonable belief 'that the alleged Government impropriety might have occurred.'" *Id.* (quoting

*Favish*, 541 U.S. at 174). That public interest showing would not have satisfied *SafeCard* both because the public interest was not in uncovering "illegality" and because the requester did not supply "compelling evidence." *SafeCard*, 926 F.2d at 1206. But it nonetheless sufficed under *Favish* to overcome Exemption 7(C).

This Court has also applied *Favish* in cases involving names in law enforcement files, where (prior to *Favish*) *SafeCard* would have been the rule. In one case, the Court allowed that a requester could assert a public interest in showing negligence or impropriety, and considered whether he had produced evidence that would "warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Cabezas v. FBI*, 109 F.4th 596, 606 (D.C. Cir. 2024) (quoting *Favish*, 541 U.S. at 174). In another, again citing *Favish*, the Court held that the requester did not "'put forth a meaningful evidentiary showing' to establish misconduct." *Knowles v. U.S. Dep't of State*, 773 F. App'x 3, 3-4 (D.C. Cir. 2019) (quoting *Favish*, 541 U.S. at 175).

To be sure, *Cabezas* and *Knowles* cited *SafeCard* too. But they did not actually apply its categorical rule. In *Cabezas*, the Court appended, without elaboration, a *SafeCard* citation to its express application of the *Favish* evidentiary burden. *See Cabezas*, 109 F.4th at 606. And *Knowles* cited *SafeCard* for its holding that "disclosure of the individuals' identities would not confirm or refute Appellant's allegations of misconduct," but without specifying either the nature of the

misconduct the appellant needed to articulate or the evidence the appellant needed to introduce. *Knowles*, 773 F. App'x 3, 4. So while these decisions do not expressly abrogate the *SafeCard* categorical rule, their application of *Favish* where *SafeCard* otherwise would have applied strongly suggest that the *SafeCard* categorical rule is no longer good law.

To the extent this Court has occasionally invoked the *SafeCard* categorical rule after *Favish*, its continued vitality was never litigated. This occurred in two iterations of a case involving a public corruption scandal. *See Citizens for Resp. & Ethics in Washington v. DOJ*, 746 F.3d 1082, 1096 (D.C. Cir. 2014); *Citizens for Resp. & Ethics in Washington v. DOJ*, 854 F.3d 675, 681-82 (D.C. Cir. 2017). The opinions did not consider whether *Favish* displaced the *SafeCard* categorical rule, and a review of the briefs shows that the parties never raised the point.

In fact, no appellate court appears to have squarely considered whether the *SafeCard* categorical rule survives *Favish*.[25] But one district court has, and concluded that it does not. The agency had argued for a "compelling evidence" test (*i.e.*, that originating from *SafeCard*), which the court rejected because it "does not

[25] Perhaps that is because no appellate cases have expressly tested that distinction. In *Cabezas* and *Knowles*, for instance, the requester failed the more lenient *Favish* standard, so it was unnecessary to consider *SafeCard*. *Union Leader* did test that distinction by implication—as explained above, the requester did not meet the *SafeCard* standard yet won under *Favish*—but the court did not expressly consider whether the two cases are consistent even though *SafeCard* was previously good law in the First Circuit. *See Church of Scientology*, 30 F.3d at 238 n.22.

appear anywhere in the *Favish* decision and appears only in D.C. Circuit case law significantly predating *Favish*." *Marino v. DEA*, 15 F. Supp. 3d 141, 154 n.9 (D.D.C. 2014). As explained above, *Marino*'s analysis is spot on.

***

In sum, the district court erred by applying the defunct *SafeCard* categorical rule. Its application of that rule skewed the balance it reached under Exemption 7(C). Properly construed, that balance favors disclosure, as Block Club now shows.

### B. The district court overstated the arrestees' and detainees' privacy interests.

Block Club does not dispute that ICE arrestees and detainees have cognizable privacy interests in the fact that they were arrested or detained. But the strength of that interest is relevant to the balancing outcome. *See ACLU*, 655 F.3d at 17. And for two reasons, the district court overstated it.

#### 1. The interest in obscuring one's arrest or detention is cognizable but not "overwhelming."

People do not, as the district court held, have an "overwhelming" interest in obscuring the fact that they were arrested or detained. J.A.51.

In assessing the strength of a privacy interest, courts consider extant statutes, as well as general practices and the common law. *See DOJ v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 764-65 (1989) (citing statutes limiting the dissemination of rap sheet information when determining the privacy interest in rap

sheets); *see also Favish*, 541 U.S. at 168 (relying on common law and cultural traditions). The more privacy-protective the authority, the stronger the privacy interest. Here, all entail that arrest and detention information is not overwhelmingly private.

Contemporary statutes show that arrest and detention information is not particularly private. In most states, public records statutes explicitly provide that records of a person's arrest or detention are open to the public, be it via incident reports, police blotters, jail logs, or similar documents. *See, e.g.*, Cal. Gov. Code § 7923.610; Colo. Rev. Stat. §§ 24-72-302(7), 24-72-303(1); Conn. Gen. Stat. §1-210(b)(3); D.C. Code Ann. §§ 5-113.01(a)(4), 5-113.06(a); Fla. Stat. §§ 119.011(3)(c), 119.071(c)(1); O.C.G.A. 50-18-72(a)(4); Idaho Code § 74-124(3)(b); 5 Ill. Comp. Stat. 140/2.15; Ind. Code § 5-14-3-5(a); Iowa Code § 22.7(9); K.S.A. 45-217(e)(2)[26]; La. Rev. Stat. Ann. § 44:3(A)(4); 16 M.R.S.A. § 706; Minn. Stat. § 13.82, subd. 2; Miss. Code §§ 25-61-3(e), 25-61-12(c); Mo. Rev. Stat. § 610.100.2(1); N.H. R.S.A. § 594:14-a; N.J.S.A. 47:1A-3(b); N.C.G.S. § 132-1.4(c); N.D.C.C. § 44-04-18.7(2); 51 O.S. § 24A.8.A; O.R.S. 192.345(3); 65 Pa.S. § 67.708(b)(16), 18 Pa.C.S. § 9102; R.I. Gen. Laws § 38-2-2(4)(D); Utah Code §§

[26] *See also* Kan. Att'y Gen. Op. 1987-25, https://ksag.washburnlaw.edu/opinions/1987/1987-025.pdf.

63G-2-103(16)(b), 63G-2-301(3)(g); 1 V.S.A. § 317(b)(5)(B); Va. Code Ann. § 2.2-3706.A.

In other states, public records statutes do not expressly single out arrest or detention information as public but have been construed that way by appellate courts or other officials who administer the public records laws. *See, e.g.*, *Hengel v. City of Pine Bluff*, 821 S.W.2d 761, 765 (Ark. 1991); Police Blotter Information, OIP Op. Ltr. No. 07-04 (Mar. 22, 2007) https://ags.hawaii.gov/oip/wp-content/blogs.dir/11/files/2007/03/0322-OIP-Op.-Ltr.-No.-07-04-KPD-re-Police-Blotter-Information-U-RFO-G-07-44.pdf; *State ex rel. Outlet Commc'ns, Inc. v. Lancaster Police Dep't*, 528 N.E.2d 175, 178 (Ohio 1988); *Houston Chron. Pub. Co. v. City of Houston*, 531 S.W.2d 177, 180, 185 (Tex. Civ. App. 1975); *Newspapers, Inc. v. Breier*, 279 N.W.2d 179, 190 (Wisc. 1979). As the Wisconsin Supreme Court put it, for example:

> From at least the time of the Magna Carta and the formalization of the writ of habeas corpus, the concealment of the reason for arrest has been as odious as the concealment of the arrest itself. It is fundamental to a free society that the fact of arrest and the reason for arrest be available to the public.

*Newspapers, Inc.*, 279 N.W.2d at 189. So contemporaneous law supports the proposition that the redacted information is not overwhelmingly private.

State law jibes with federal practice. In particular, DHS maintains a public database with names, images, alleged crimes, and arrest locations of over 41,000

individuals that it describes as "the worst of the worst criminal aliens arrested by [ICE]."[27] Below each person's information is a link to share that information on Truth Social, X, and Facebook. So contemporaneous practice—ICE's publishing arrest and detention information and encouraging the public to disseminate it—also does not treat a person's arrest or detention as a particularly private fact.

State law and federal practice mirror the common law. In defining privacy under Exemption 7(C), *Favish* relied on the tort of publicity given to private life as articulated in the Second Restatement of Torts. *See Favish*, 541 U.S. at 169. The drafters of the Second Restatement recognized that information about "arrests" is an example of "[a]uthorized publicity" whose disclosure is not tortious. *See* Restatement (Second) of Torts, § 652D, cmt. g. Because disclosing the fact of an arrest does not violate the privacy tort, that fact is not particularly private under the common law. Indeed, if it were, ICE's "share" function would be an inducement for the public to violate state tort-law rights of tens of thousands of people.

State statutes, federal practice, and the common law converge on the same conclusion: information about a person's arrest or detention is not particularly private. So while perhaps people have more than a *de minimis* interest in obscuring

---

[27] Arrested: Worst of the Worse, *Department of Homeland Security*, https://www.dhs.gov/wow?page=0. As of the date of this writing, the database has 3,419 pages, each with 12 people. It is unclear whether the "crimes" listed include suspected crimes as well as convictions.

that information, that interest is certainly not "overwhelming." J.A.51. The district court thus overstated the privacy interest at stake.

### 2. The district court failed to consider the potential benefits of disclosure to arrestees and detainees.

In considering the strength of a privacy interest, courts must assess both the pros and cons of disclosure to the affected individual. Thus, when individuals have an "interest in the disclosure of their names," it is "overly paternalistic to insist upon protecting an individual's privacy interest when there is good reason to believe that he or she would rather have both the publicity and the [benefit] than have neither." *Lepelletier v. FDIC*, 164 F.3d 37, 48 (D.C. Cir. 1999).

Disclosure has the potential to benefit ICE arrestees and detainees at this particular moment in history, where lawmakers and the public are closely scrutinizing ICE's choices with respect to arrests and detentions. As shown above, members of Congress are extensively studying those practices and introducing legislation to improve detainees' situations, while public exposure of some practices has led to real change, such as for family separation. *See* Section V.A.2, *supra*. The prospect of such benefits is presumably why many arrestees and detainees have given on-the-record interviews to journalists, many of whose stories have impelled action from elected officials.

The district court was "unpersuaded" by this point because other arrestees and detainees likely would not favor disclosure. J.A.53. No doubt that is true for some.

But the district court elevated those interests over that of the group in general, and was wrong to do so, especially because the government bears the burden of proof and failed to offer any evidence about the preferences of any particular arrestees or detainees.

When assessing the strength of a privacy interest over a group, courts consider all members of the group, not just those who prefer privacy the most. For instance, in *Washington Post v. HHS*, this Court assessed the strength of federal consultants' privacy interest in information about their financial holdings. In doing so, it considered a survey of those consultants (something the government has not provided here), in which some consultants expressed privacy concerns in that information while others did not. Rather than defer to those who found the information most sensitive, this Court considered the whole group in defining the strength of the interest. It held that there was a cognizable privacy interest, but not a particularly strong one. *See Washington Post Co. v. HHS*, 690 F.2d 252, 261-62 (D.C. Cir. 1982).

This Court's reasoning tracks the invasion-of-privacy tort, which, as shown above, is informative in identifying privacy interests under Exemption 7(C). Per the Second Restatement, disclosure is tortious only if it would be "highly offensive to a reasonable person." Restatement (Second) of Torts, § 652(D). And offensiveness turns on "the customs of the time and place." *Id*. cmt. (c). Naturally, customs are a

function of all community members, not just those most sensitive to privacy concerns.

The district court thus erred by considering only a subset of the arrestee and detainee community. To be sure, some members of that community likely would prefer not to be named. For that reason, the privacy interest is not zero. But just as it would be wrong to discount those community members' interests, so too would it be wrong to place their interests above the subset who would opt for disclosure given the potential benefits. The district court did so, and that was error.

Thus, arrestees and detainees have cognizable privacy interests, but they are not overwhelming. The law does not place an overwhelming premium on obscuring that one was arrested or detained (nor even does ICE itself, at least as to those tens of thousands whose arrests and detentions it has chosen to publicize), and disclosing that fact would tangibly benefit a sizeable part of the non-citizen population that ICE's redactions are ostensibly protecting. So while the district court was right to balance their interests against the public interest in disclosure, it tilted the scales too far in favor of privacy.

### C. The district court understated how the records would advance the public interests in disclosure.

Two public interests, separately and together, overcome arrestees' and detainees' privacy interests in their names. The district court was wrong to conclude otherwise.

### 1. The records would advance the public's interest in testing the veracity of the government's claims that its immigration efforts focus on "violent criminal illegal aliens."

Block Club first argued that the records would allow the public to test ICE's claims that (1) it has not arrested or detained U.S. citizens, and (2) its enforcement efforts have focused on violent criminals. As Block Club argued, once armed with the names of those arrested and detained, the public could research their backgrounds, using publicly available information like voter registration and criminal records, to ascertain how many of them actually are violent criminals and/or not U.S. citizens—a "derivative" public interest. *See ACLU*, 655 F.3d at 7.

The district court did not doubt the strength of that interest. It found the interest "significant and compelling." J.A.53. But it discounted it for two reasons, both erroneous.

The court held that Block Club did not meet its evidentiary burden under *SafeCard* to provide "compelling evidence" of illegal activity. J.A.51-52. For instance, Block Club had pointed to a study by *ProPublica* showing that ICE had detained at least 170 U.S. citizens in the first nine months of the current administration—contrary to the unequivocal statement by the Secretary of Homeland Security roughly eight months into the administration that "no American

citizens have been arrested or detained."[28] While not doubting the *bona fides* of that study, the court held that that evidence was not sufficiently compelling to count the interest in the balance.

As shown above, by requiring "compelling evidence," the district court wrongly followed the now-defunct *SafeCard* rule. The court instead should have ascertained whether Block Club's evidence would "warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Favish*, 541 U.S. at 174.

Block Club easily cleared that threshold. No doubt it is improper for the Secretary of Homeland Security to falsely tell the American public that her agency has arrested or detained "no[ne]" of their fellow citizens.[29] And surely a reasonable person could credit a study by a reputable news organization that entails that the Secretary's statement is false.

The district court also held that the records would not further the public's interest in testing the government's claims—at least not enough to overcome the

---

[28] Adrian Florido, NPR fact checks Kristi Noem on ICE detaining US citizens, *NPR*, 2 (Nov. 5, 2025), https://docs.house.gov/meetings/JU/JU10/20251119/118665/HHRG-119-JU10-20251119-SD006-U6.pdf.

[29] Adrian Florido, NPR fact checks Kristi Noem on ICE detaining US citizens, *NPR*, 2 (Nov. 5, 2025), https://docs.house.gov/meetings/JU/JU10/20251119/118665/HHRG-119-JU10-20251119-SD006-U6.pdf.

privacy interests it identified. In its view, the records would have "limited probative force" when combined with publicly available information like voter registration records and criminal history information. J.A.52.

With respect to the interest in testing the claims as to non-citizens, the court observed that a minority of citizens are not registered to vote, so absence on a voter list is compatible with one's being a citizen. J.A.52. But that has minimal import here: the disputed records plus the voter information can still surface instances of wrongfully detained Americans. *See* 10 ILCS 5/1A-25(b) (providing that "any person may view" the centralized statewide voter registration list on a computer screen at the Springfield Office of the State Board of Elections). After all, if a detained or arrested individual is ***on*** the voter list, he or she is necessarily a wrongfully detained citizen. The district court's observation—that a detained individual ***not on*** the voter list could be either a wrongfully detained American ***or*** a lawfully detained non-citizen—merely shows that the public cannot know the full extent of the government's misrepresentation. But no case holds that to count in the public-interest balance, the record must give a perfect accounting of the full extent of the government's misconduct.

As to the interest in testing the claims that arrests and detentions have focused on violent criminals, the district court said virtually nothing.[30] Nor is there a persuasive reason to doubt that arrestees' and detainees' names would further that interest. With the names in hand, the public can cross-reference criminal records, which are publicly available, to determine if they have violent criminal histories. The public can then decide if DHS is being truthful when claiming to focus on violent criminals.

Thus, the district court wrongly undervalued how the records will further the public's interest in testing the government's claims.

### 2. The records would advance the public's interests in overseeing the government's exercise of discretion in its arrest and detention practices.

Block Club also argued below that names are essential to reporting on the government's arrest and detention practices, in which there is also a significant public interest; individuals' stories are a key part of much of the reporting on those governmental practices, including those cited in the congressional studies referenced above. *See* Section V.A.2, *supra*.

---

[30] The court held merely that interviews may be an ineffective way to determine a person's criminal history. J.A.52. But it did not address the fact that criminal histories are also available via "governmental and private search tools," which Block Club argued below. ECF No. 21 at 7.

There plainly is a cognizable public interest in exposing this information. Understanding how ICE exercises its discretion on issues such as what conditions it imposes on detainees, how long they are held, how frequently they are transferred to detention centers far away from their families and lawyers, and the like, plainly sheds light on ICE's "performance of its statutory duties," *Dep't of Def. v. FLRA*, 510 U.S. 487, 497 (1994), and is a matter of "substantive law enforcement policy" that constitutes a substantial public interest, *Citizens for Resp. & Ethics in Washington*, 746 F.3d at 1093.

Arrestees' and detainees' names, in turn, are necessary to further that interest. Telling their stories requires interviewing them. But many lack the resources or wherewithal to seek out reporters. J.A.44. And as Block Club's journalists have experienced, ICE will not provide information about individual incidents unless the journalist first names those involved. *Id.*

The district court did not directly address this point. The closest it came was to hold that the "incremental value of interviews is even more speculative, as it assumes the public could successfully contact these individuals and receive truthful responses about their citizenship and criminal history." J.A.52. But the court offered no basis for its skepticism that Block Club could successfully contact

individuals on the list.[31] To the contrary, as shown above, many journalists have found ways to speak with arrestees and detainees. *See* Section V.A.2, *supra*. And while it may be hard to contact those who have been deported, ICE has not introduced evidence of how many of its detainees or arrestees are no longer in the country. Some could well be American citizens; assessing that is part of why Block Club submitted the request in the first place. The district court's rationale offers no basis to diminish this public interest.

### D. The public interests prevail.

As explained above, the district court erred in defining and balancing the interests. It wrongly started by requiring a showing under *SafeCard*. It overvalued the privacy interests. And it undervalued the records' contribution to the public interests.

Properly balanced, the interests favor disclosure. There is a strong interest in assessing how far ICE has misled the public about its immigration operations, and in exposing (and thus potentially rectifying) discretionary arrest and detention practices. As explained above, identifying ICE arrestees and detainees is critical for all of the above.

---

[31] Its skepticism that the individuals would give truthful answers about their citizenship and criminal histories appears targeted at Block Club's asserted interest in testing the government's claims, discussed above, which can be furthered by the names and public data alone. The court's skepticism is also unexplained as to that issue too.

On the other side of the balance are the interests of some individuals who would prefer not to be identified. All available authorities—state statutes, the common law, and ICE's own practice—afford little weight to that preference. And that preference itself must be balanced against the views of other detainees who would likely welcome disclosure at this particular point in history, as have many before them. While these interests are not zero, they are not significant enough to overcome the public interests the district court rightly held to be "compelling." J.A.53.

This result finds support in the most on-point appellate case, *Union Leader*. There, the First Circuit balanced individuals' privacy interest in the fact of their arrest by ICE with the public interest in assessing why ICE had delayed deporting them. *Union Leader*, 749 F.3d at 56. The public interest prevailed. *See id*.

It prevails here too. The privacy interests are the same: the fact that a person was arrested (or detained) by immigration authorities. And here the public interest is both stronger and more directly advanced by the records. In *Union Leader*, the public interest was in assessing why ICE had delayed in deporting six noncitizens it knew to have criminal histories. *See Union Leader*, 749 F.3d at 48-49, 56. Learning those individuals' names would allow the requester (a news organization) to look up their background, which could "potentially bring[] to light the reasons for ICE's apparent torpor." *Id*. Here, the interests are stronger: testing the veracity of ICE's

statements on extremely controversial issues, and illuminating how ICE exercises its discretion on significant practices such as detention conditions. And unlike *Union Leader*, the records would do more than "potentially" further the relevant interests. The criminal history, for example, would ***necessarily*** show if the detainee had been indicted for or convicted of a crime of violence, and voter records could show which detainees are U.S. citizens (albeit with some possible false negatives).

Judge Tatel's separate opinion in *Center for National Security Studies v. DOJ*, 331 F.3d 918 (D.C. Cir. 2003) is also instructive. There, the agency withheld the identities of September 11 detainees under various FOIA exemptions, including Exemption 7(C).[32] But as Judge Tatel observed, "the law is nevertheless clear that no right of privacy is violated by the disclosure of 'an official act such as an arrest.'" *Id.* at 945-46 (Tatel, J., dissenting) (quoting *Am. Fed'n of Gov't Emps., AFL-CIO v. HUD*, 118 F.3d 786, 794 (D.C. Cir. 1997)). He found it "unconvincing" that the agency was supposedly concerned with the detainees' privacy given that it released information about some of them, which ICE did here. *Id.* at 945. He found any privacy interests overcome by the public interest in understanding how the government treated those it confines. *Id.* at 946. He found public reporting, like that which Block Club has cited here, sufficient to trigger the public interest. *Id.* at 946-

[32] The majority upheld the redactions under Exemption 7(A) so did not consider the privacy exemptions. *See id.* at 925.

47. And he reached all these conclusions under the strictures of the then-operative *SafeCard* rule—*Favish* had not yet been decided. Perforce, the same result follows here.

In the end, the privacy balance instantiates the foundational maxim that "in many important public matters, it is for the public to know and then to judge." *Stern v. FBI*, 737 F.2d 84, 94 (D.C. Cir. 1984). Here, the public has a right to know who its government arrests and why, and how it treats those it confines. And it has a right to pass judgment when all the relevant facts have emerged. No tenuous privacy interest vitiates those rights. The district court erred by holding otherwise.

## IX. CONCLUSION

The Court should reverse, order entry of summary judgment for Block Club, and instruct the district court to order ICE to produce the detainees' and arrestees' names.

Dated: September 28, 2026

Respectfully Submitted,

/s/ Stephen Stich Match

Matthew V. Topic
D.C. Circuit Bar No. 62160
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
Phone: (312) 243-5900
Email: matt@loevy.com

Stephen Stich Match
D.C. Circuit Bar No. 64156
LOEVY & LOEVY
222 Sutter Street, Suite 600A
San Francisco, CA 94108
Phone: (312) 243-5900
Email: match@loevy.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(g)

I certify that the foregoing brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because the brief contains 9,260 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit R. 32(e)(1).

I certify that the foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14 point Times New Roman font.

Dated: September 28, 2026

*/s/ Stephen Stich Match*
Stephen Stich Match
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2026, I caused copies of the foregoing Appellant's Opening Brief to be served on all counsel of record via the Court's ECF filing system.

Dated: September 28, 2026

*/s/ Stephen Stich Match*
Stephen Stich Match
*Counsel for Plaintiff-Appellant*