[ORAL ARGUMENT NOT YET SCHEDULED]

**No. 26-5234**

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**BLOCK CLUB CHICAGO**,

Plaintiff/Appellant,

v.

**UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,**

Defendants/Appellees.

---

On Appeal from the United States District Court
for the District of Columbia
(No. 1-25-cv-01335, Honorable Tanya S. Chutkan)

---

# BRIEF FOR THE AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA AS *AMICUS CURIAE* IN SUPPORT OF APPELLANT AND REVERSAL

---

Arthur B. Spitzer
Lauren Pelosi*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street NW, Suite 420
Washington, DC 20045
202-457-0800
aspitzer@acludc.org
lpelosi@acludc.org

October 5, 2026

*Counsel for Amicus Curiae*

---

* Ms. Pelosi is not yet admitted to the bar. She is practicing under the supervision of attorneys at the American Civil Liberties Union Foundation of the District of Columbia.

## COMBINED CERTIFICATES

### Certificate as to Parties, Rulings, and Related Cases

Except for American Civil Liberties Union of the District of Columbia, all parties, intervenors, and *amici* that have appeared in this Court are listed in the Brief for the Appellant. References to the rulings at issue and related cases also appear in Appellant's Brief. *Amicus* is not aware of any other related cases.

### Statutes and Regulations

All applicable statutes and regulations are contained in the addendum to the Brief for Appellants, the addendum to the Brief for Appellee, and the Joint Appendix.

### Corporate Disclosure Statement

Pursuant to Circuit Rule 29(a)(4)(A), *amicus* American Civil Liberties Union of the District of Columbia states that is a 501(c)(3) non-profit organization and has no parent corporations. It does not issue any stock, and therefore no publicly owned corporation holds ten percent or more of its stock.

*/s/ Arthur B. Spitzer*
Arthur B. Spitzer

*Counsel for Amicus Curiae*

**TABLE OF CONTENTS**

COMBINED CERTIFICATES ........................................................................ ii

TABLE OF AUTHORITIES........................................................................ iv

GLOSSARY ........................................................................................ xiii

INTEREST OF *AMICUS* ........................................................................1

SUMMARY OF ARGUMENT ...................................................................2

ARGUMENT ..........................................................................................4

I. Since the Nation's Founding, Governments at All Levels Have Recognized that the Identities of People in Custody Are Public Information ..........................................................................4

II. State Courts Consistently Reject Arguments that Personal Privacy Permits Law Enforcement Agencies to Conceal the Identities of People in Custody ..........................................................................14

III. Disclosure of Arrest Information Serves Functions Indispensable to Our Democracy..........................................................................17

1. Protection of arrestees ..........................................................20
2. Deterrence of government misconduct ...................................23
3. Democratic self-governance....................................................24

CONCLUSION ......................................................................................28

## TABLE OF AUTHORITIES*

**Cases** **Page(s)**

*Advocs. for Hum. Rts. v. Blanche*,
No. 1-26-cv-00865 (RC), 2026 WL 2607203 (D.D.C. Sep. 3, 2026)..................19

*Advocs. for Hum. Rts. v. U.S. Dep't of Homeland Sec.*,
825 F. Supp. 3d 858 (D. Minn. 2026)........................................................ 18, 19

*Caledonian Rec. Pub. Co. v. Walton*, 573 A.2d 296 (Vt. 1990) ..............................10

*Cnty. of Los Angeles v. Superior Ct.*, 22 Cal. Rptr. 2d 409 (Cal. App. 1993)..........11

*Connell v. CIA*, 110 F.4th 256 (D.C. Cir. 2024)........................................................1

*Ctr. for Nat'l Sec. Stud. v. DOJ*, 331 F.3d 918 (D.C. Cir. 2003).................. 1, 12, 13

*Dillon v. DOJ*, 444 F. Supp. 3d 67 (D.D.C. 2020).................................................14

*Hengel v. City of Pine Bluff*, 821 S.W.2d 761 (Ark. 1991)......................................10

*Houston Chron. Publ'g Co. v. City of Houston*,
531 S.W.2d 177 (Tex. Civ. App. 1975)........................................................ 15, 16

*Lebanon News Publ'g Co. v. City of Lebanon,*
451 A.2d 266 (Pa. Commw. Ct. 1982) ...............................................................10

*Morrow v. District of Columbia*, 417 F.2d 728 (D.C. Cir. 1969)...............................4

*Mott v. City & Cnty. of Honolulu*, 146 Haw. 210 (Ct. App. 2020) ..........................16

*N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978) ................................24

* Authorities chiefly relied upon are identified with asterisks.

*Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157 (2004) ..............................26

*Newspapers, Inc. v. Breier*, 89 Wis. 2d 417 (1979) .......................................... 16, 17

* *Paul v. Davi*s, 424 U.S. 693 (1976)..........................................................11, 12, 16

*Practical Political Consulting v. Sec'y of State*, 287 Mich. App. 434 (2010).........15

*Schrecker v. DOJ*, 349 F.3d 657 (D.C. Cir. 2003) ...................................................14

*Senate of Puerto Rico v. DOJ*, 823 F.2d 574 (D.C. Cir. 1987) ......................... 13, 14

*Sheehan v. City of Binghamton*, 398 N.Y.S.2d 905 (App. Div. 1977) .....................10

*State ex rel. Outlet Commc'ns, Inc. v. Lancaster Police Dep't*,
38 Ohio St. 3d 324 (1988) .........................................................................10

*State v. Brown*, 467 So.2d 1151 (La. Ct. App. 1985)..............................................10

*Tennessean Newspaper, Inc. v. Levi*, 403 F. Supp. 1318 (M.D. Tenn. 1975)............8

*The Cleveland Co. v. Smith* (Ohio Ct. C.P. July 21, 1920), *reprinted in* Harold L.
Cross, *The People's Right to Know* (1953), https://perma.cc/48Q8-S98Z.........7, 8

*Times Dispatch Publishing Co. v. Sheppard* (Hustings Ct. of City of Richmond
Jan. 13, 1933), *reprinted in* Harold L. Cross, *The People's Right to Know*
(1953), https://perma.cc/48Q8-S98Z ......................................................8

*Trump v. Barbara*, 146 S. Ct. 2438 (2026) ...............................................................2

*United States v. Ross*, 259 F. Supp. 388 (D.D.C. 1966)..........................................11

*Urquilla-Ramos v. Trump*, 821 F. Supp. 3d 603 (S.D.W. Va. 2026).......................17

**Statutes**

* 5 Ill. Comp. Stat. Ann. 140/2.15(a) .......... 11

5 Ill. Comp. Stat. Ann. 140/2.15(c) .......... 11

5 U.S.C. § 552(b)(7)(A) .......... 13

65 Pa. Stat. § 67.708(b)(16) .......... 10

Cal. Gov't Code § 7923.610 .......... 8

Colo. Rev. Stat. § 24-72-302(7) .......... 8

Colo. Rev. Stat. § 24-72-303(1) .......... 8

Conn. Gen. Stat. § 1-215 (formerly § 1-20b) .......... 8

D.C. Code § 5-113.06 .......... 9

Fla. Stat. § 119.011(3)(c) .......... 9

Ga. Code Ann. § 17-4-27 .......... 9

Ga. Code Ann. § 50-18-72(a)(4) .......... 9

Idaho Code § 74-124(3)(b) .......... 9

Ind. Code § 5-14-3-5(a) .......... 9

Ind. Code § 5-14-3-5(b) .......... 9

Iowa Code § 22.7(9) .......... 9

La. Code Crim. Proc. art. 228 .......... 9

Mass. Gen. Laws ch. 41, § 98F .......... 9

Md. Code Ann., Crim. Proc. § 10-201(d)(iii) .......... 9

Me. Rev. Stat. Ann. tit. 16, § 708(2) ........................................................................9

Minn. Stat. § 13.82(2) ........................................................................9

Mo. Rev. Stat. § 610.100.2(1) ........................................................................9

N.C. Gen. Stat. § 132-1.4(c) ........................................................................9

N.D. Cent. Code § 44-04-18.7(2) ........................................................................9

N.H. Rev. Stat. Ann. § 594:14-a ........................................................................9

N.J. Rev. Stat. 47:1A-3(b) ........................................................................9

Ohio Rev. Code Ann. § 149.43(A)(2)(b) ........................................................................9

Ohio Rev. Code Ann. § 149.435(A)(5) ........................................................................9

Okla. Stat. tit. 51 § 24A.8 ........................................................................9

Or. Rev. Stat. § 192.345(3) (formerly §192.501(3)) ........................................................................9

R.I. Gen. Laws § 38-2-3.2 ........................................................................10

Tex. Gov't Code Ann. § 552.108(c) ........................................................................10

Va. Code Ann. § 2.2-3706(A)(2) ........................................................................10

Vt. Stat. Ann. tit. 1, § 317(c)(5) ........................................................................10

**Regulations**

* 28 C.F.R. § 20.20(b)(2) ........................................................................12

* 28 C.F.R. § 50.2(b)(3)(i) ........................................................................12

* 28 C.F.R. § 50.2(b)(3)(iv) ........................................................................12

**Other Authorities**


1 William Blackstone, Commentaries on the Laws of England (1765) ....................6

*18 Chicago Residents Brutalized by Federal Agents During a Military-Style Immigration Raid File Legal Claims Seeking Accountability and Justice*, Nat'l Immigrant Just. Ctr. Press Release (May 13, 2026), https://perma.cc/YVW6-W4ZN ......................................................................17

63 Op. Att'y General 543 (Md. 1978) .......................................................................10

*Standards Relating to Fair Trial and Free Press: Tentative Draft*, ABA (1966), https://perma.cc/8V83-GVRN..........................................................7

*ACLU-PA Announces Settlement with Pennsylvania State Police in Ethnic Profiling Lawsuit*, ACLU of Pa. Press Release (Apr. 6, 2022), https://perma.cc/ZG2H-2JY3 ........................................................................1

Aditi Shah & Eunice Hyunhye Cho, *No Fighting Chance: ICE's Denial of Access to Counsel in U.S. Immigration Detention Centers*, ACLU (2022), https://perma.cc/34RG-HR6C ......................................................................19

Aditi Shah, *Without Access to Counsel, Detained Immigrants Face Increased Risks of Prolonged Detention and Unlawful Deportation*, ACLU (June 22, 2022), https://perma.cc/3QCU-QQ3X..................................................................18

Adrian Florido, *NPR fact checks Kristi Noem on ICE detaining US citizens*, NPR: All Things Considered (Nov. 5, 2025), https://perma.cc/J3T3-A4WE ......22

Allie Preston, *Masked and Unidentifiable: The Risks of Federal Law Enforcement Operating Without Identification*, Ctr. for Am. Progress (Aug. 28, 2025), https://perma.cc/FSQ9-VBAF ......................................................................17

Christine Fernando, *'Inhumane' conditions at Chicago-area ICE facility, advocates allege in new lawsuit*, PBS News (Oct. 31, 2025), https://perma.cc/2E2B-54SW. ......................................................................19

Daan Bronkhorst, *Naming Names: Identity and Identification in Human Rights Work*, 16 Netherlands Q. of Human Rights 457 (1998), https://perma.cc/X49M-CNVQ ....................5

Denise C. Bell & Naureen Shah, *Agents of Chaos and Cruelty*, ACLU (2026), https://perma.cc/VNW7-UFBX....................22

Diana Flores, *How ICE's detention system makes people untraceable*, Am. Friends Service Committee (Dec. 30, 2025), https://perma.cc/WWQ6-QJL4.................... 17, 18

Gary D. McAlvey & Gary R. Cooper, *Public Access to Criminal History Record Information,* DOJ Crim. Just. Info. Pol'y, NCJ-111458 (1988), https://hdl.handle.net/2027/mdp.39015025381057....................6

*Enforced disappearance inflicts profound suffering on victims and violates their right not to be subjected to torture and other cruel, inhuman or degrading treatment*, Council of Eur. Comm'r for Hum. Rts. (Aug. 29, 2025), https://perma.cc/N4HP-ZR72....................27

Frank Luther Mott, *American Journalism: A History of Newspapers in the United States Through 260 Years: 1690 to 1950* (N.Y., The MacMillan Co. 1941), https://perma.cc/BDR3-CCDP ....................7

Graeme Blair & David Hausman, *Immigration Enforcement in the First Nine Month of the Second Trump Administration*, Deportation Data Project (Jan. 27, 2026), https://perma.cc/65AH-ZDML..........26

* H.R. Rep. No. 83-2332 (1954) ....................4, 11

*ICE Detained Them, and Then They Vanished*, The Marshall Project (June 1, 2026), https://perma.cc/HN86-ZC9H ....................18

*Immigration Detention Expansion in Trump's Second Term*, Am. Immigr. Council (Jan. 14, 2026), https://perma.cc/8WRK-9DWD ....................26

James Madison, Letter to W.T. Barry (Aug. 4, 1822), *reprinted by* Nat'l Archives: Founders Online, https://perma.cc/59AL-6PGB....25

James Russell Wiggins, *Remarks to the Maine Press Association*, *in* James Russell Wiggins Collection (1974), https://perma.cc/8SBF-LWBK ....................................................................24

James Russell Wiggins, *Secret Criminal Justice*, *in* James Russell Wiggins Collection (1975), https://perma.cc/ZY7F-6VTT. ....................................... 21, 27

Jeff Gammage & Angela Couloumbis, *ACLU Sues Pennsylvania State Police, Alleging They've Overstepped in Acting as Immigration Authorities*, ProPublica (June 28, 2019), https://perma.cc/852B-4NX8....................................1

Margy O'Herron*, ICE and Customs and Border Protection Budgets to Exceed $200 Billion*, Brennan Ctr. for Just. (June 25, 2026), https://perma.cc/L2TE-WH7V ....................................................................24

Matt Loffman, *Poll: Nearly two-thirds of Americans say ICE has gone too far in immigration crackdown*, PBS News (Feb. 5, 2026), https://perma.cc/634K-HNJ9 ......................................................................24

Memorandum from The Chief of the Central Department (Feb. 11, 1943), *translated in* 7 Office of United States Chief of Counsel for the Prosecution of Axis Criminality, *Nazi Conspiracy and Aggression* (1946), https://perma.cc/3XVJ-9FDB ......................................................................5

Memorandum from The Chief of the Central Office (June 7, 1943), *translated in* 7 Office of United States Chief of Counsel for the Prosecution of Axis Criminality, *Nazi Conspiracy and Aggression* (1946), https://perma.cc/3XVJ-9FDB ......................................................................5

Memorandum from The Chief of the Supreme Command of the Armed Forces (Dec. 12, 1941), *translated in* 7 Office of United States Chief of Counsel for the Prosecution of Axis Criminality, *Nazi Conspiracy and Aggression* (1946), https://perma.cc/3XVJ-9FDB ......................................................................5

Michael J. Petrick, *The Press, the Police Blotter, and Public Policy*, 46 Journalism Q. 475 (1969), https://perma.cc/U422-JKNG ................................7

*New ACLU Report Documents Widespread and Unchecked Civil Rights Abuses by Immigration Agents in President Trump's Second Term*, ACLU Press Release (July 16, 2026), https://perma.cc/7RMG-3KQN...............18

Off. of Info. Pracs. Op. Ltr. No. 91-4, 1991 WL 474701 (Mar. 25, 1991) .............16

Pranav Baskar & Hamed Aleaziz, *U.S. Deports Nine Migrants in Secret, Ignoring Legal Protections*, N.Y. Times (Feb. 16, 2026), https://perma.cc/AVZ8-FHKS .........................................................................17

Rachel Reed, *ICE used solitary confinement more than 14,000 times in the past five years, report reveals*, Harvard L. Today (Feb. 6, 2024), https://perma.cc/R7FW-4LKB.........................................................................19

Reporters Committee for Freedom of the Press, *Arrest Record*, https://perma.cc/N796-URWP (last visited Oct. 2, 2026) ...................................15

Reporters Committee for Freedom of the Press, *Police Blotter*, https://perma.cc/4SR5-4M6P (last visited Oct. 2, 2026)........................................6

Suzanne Le Mignot, *Chicago police craft stance of Trump's mass deportation policy*, CBS News (Jan. 14, 2025), https://perma.cc/BKF6-USN4. ........................................................................19

* The Federalist No. 84 (Alexander Hamilton)...........................................................6

*Trump's first immigration raid to target 300 people in Chicago on Tuesday*, The Guardian (Jan. 18, 2025), https://perma.cc/UKW2-N7VY. ..........................20

U.S. Immigration and Customs Enforcement, *Detention Facilities*, https://www.ice.gov/detention-facilities (last accessed Oct. 2, 2026) ................21

U.S. Immigration and Customs Enforcement, *Online Detainee Locator System*, https://locator.ice.gov/odls/#/search (last accessed Oct. 2, 2026) ........................21

*Unchecked Authority: Examining the Trump Administration's Extrajudicial Immigration Detentions of U.S. Citizens*, U.S. Senate Permanent Subcommittee on Investigations (2025), https://perma.cc/VN5G-572C .............22

Walter A. Steigleman, *The Legal Problem of the Police Blotter,* 20 Journalism Q. 30 (1943), https://perma.cc/BVN6-E8SC ..................................6

Zolan Kanno-Youngs & Hamed Aleaziz, *Trump's Deportation Plan Could Start Next Week in Chicago*, N.Y. Times (Jan. 18, 2025), https://perma.cc/K7AR-84X6. .......................................................................20

## GLOSSARY

| **Term or Abbreviation** | **Definition** |
|---|---|
| ACLU | American Civil Liberties Union |
| DOJ | U.S. Department of Justice |
| FBI | Federal Bureau of Investigation |
| FOIA | Freedom of Information Act |
| ICE | Immigration and Customs Enforcement |
| Mem. Op. | Memorandum Opinion in *Block Club Chicago v. U.S. Dep't of Homeland Sec.*, No. 1-25-cv-01335 (TSC) (D.D.C. Apr. 23, 2026) |

## INTEREST OF *AMICUS*

The American Civil Liberties Union of the District of Columbia is the Washington, D.C., affiliate of the American Civil Liberties Union, a nonpartisan public interest law and policy organization. The ACLU and its local affiliates have been active for many years in defending the right of access to public information. *See, e.g.*, *Connell v. CIA*, 110 F.4th 256 (D.C. Cir. 2024). They have specifically argued that the Freedom of Information Act should not be inverted to conceal information that historically has been regarded as fundamentally public. *See Center for National Security Studies v. DOJ*, 331 F.3d 918, 928 (D.C. Cir. 2003).

In turn, access to information advances the ACLU's work by uncovering civil rights concerns that lead to litigation and advocacy. For example, plaintiffs represented by the ACLU of Pennsylvania won a significant settlement in a suit that was prompted by investigative journalism. *ProPublica* and *The Philadelphia Inquirer* used public records requests to obtain traffic stop records which revealed that state police were racially profiling drivers and usurping federal immigration enforcement authority.[1] The ACLU's mission would thus be hindered if access to basic law enforcement information were blocked.

[1] Jeff Gammage & Angela Couloumbis, *ACLU Sues Pennsylvania State Police, Alleging They've Overstepped in Acting as Immigration Authorities*, ProPublica (June 28, 2019), https://perma.cc/852B-4NX8; *ACLU-PA Announces Settlement with Pennsylvania State Police in Ethnic Profiling Lawsuit*, ACLU of Pa. Press Release (Apr. 6, 2022), https://perma.cc/ZG2H-2JY3.

The ACLU and its affiliates are also directly involved in protecting the rights of immigrants. *See, e.g.*, *Trump v. Barbara*, 146 S. Ct. 2438 (2026). In our view, access to the records sought in this case will benefit, not harm, individuals arrested by ICE.

Pursuant to Circuit Rule 29(a)(4)(E), *amicus* certifies that no counsel for a party authored this brief in whole or in part and that no person or entity other than *amicus*, its members, or its counsel, made a monetary contribution to the preparation or submission of this brief. Pursuant to Circuit Rule 29(b), this brief is being filed with the consent of all parties.

## SUMMARY OF ARGUMENT

Secret arrests have always been anathema in the United States. Alexander Hamilton warned that they are a hallmark of arbitrary government, extinguishing the possibility of public scrutiny over the arrest power. For the two centuries that police departments have existed in this country, they have made arrest information open to the public. When some attempted to conceal the identities of arrested individuals, courts found that the common law and constitutional principles compelled disclosure. And the overwhelming majority of states have codified these principles in statutes explicitly providing that arrest information shall be open for public inspection or subject to disclosure under public records laws. Where such statutes have left room for interpretation, state courts consistently have found that any

privacy interests of arrestees in concealing the fact of their arrest and detention pale in comparison to the compelling public need to prevent secret arrests.

In purporting to follow precedent holding that the government has the authority to conduct secret arrests, the district court got this history wrong. None of the inapposite case law it relied upon contravenes our nation's firm tradition of open access to arrest information or supports that law enforcement can point to privacy concerns to withhold the names of individuals it has *arrested*.

Indeed, the district court holding highlights why secret arrests are so dangerous. Without access to the identities of the people ICE arrested in its raids in Chicago during the first ten days of the current presidential administration, journalists, public interest organizations, and the public cannot determine whether those individuals are still in the country and, if so, where they are being held. They cannot research their backgrounds to learn if they are citizens or permanent residents or whether they have been convicted of crimes. They cannot contact them to learn about their conditions of confinement or report on their personal stories. At bottom, without the identities of arrested individuals, the public cannot understand the full nature and purpose of ICE's massive law enforcement efforts, which involve widespread rights violations and the expenditure of unprecedented levels of public funds. Access to this information is both the core concern of FOIA and a structural necessity in a functional democracy.

## ARGUMENT

Appellant (Plaintiff) seeks the identities of individuals arrested by the United States Immigration and Customs Enforcement ("ICE")—information that police departments, states, and federal agencies consistently have made public since the nation's conception. To obtain it, they filed a request and then a lawsuit under the Freedom of Information Act ("FOIA"), which gives teeth to the foundational principle of self-government that public access to information can help tame even the State's most dangerous powers.

Public scrutiny is perhaps nowhere more urgently directed than at the State's awesome power of arrest. And scrutiny is even more important, not less, for arrestees who lack the constitutional protections afforded to those charged with a crime. It is therefore paramount that in this case, this Court adhere to the principle that "'secret arrests' [are] a concept odious to a democratic society." *Morrow v. District of Columbia*, 417 F.2d 728, 741-42 (D.C. Cir. 1969) (quoting H.R. Rep. No. 83-2332 (1954)).

### I. Since the Nation's Founding, Governments at All Levels Have Recognized that the Identities of People in Custody Are Public Information

Time and time again, despotic governments have weaponized secret arrests to suppress dissent and make public accountability impossible. For example, Hitler's 1941 "Nacht und Nebel" (Night and Fog) Decree provided for the secret transport

of arrested persons to Germany, leaving "third persons . . . in uncertainty as to the whereabouts of prisoners." Memorandum from The Chief of the Central Department (Feb. 11, 1943), *translated in* 7 Office of United States Chief of Counsel for the Prosecution of Axis Criminality, *Nazi Conspiracy and Aggression* 84 (1946), available at https://perma.cc/3XVJ-9FDB. German authorities never disclosed the names of their prisoners, who were denied mail and "permission for interviews." Memorandum from The Chief of the Central Office (June 7, 1943), *translated in Nazi Conspiracy and Aggression* 85. These secret arrests were designed to effectuate "[e]fficient and enduring intimidation" that would deter resistance to the regime. Memorandum from The Chief of the Supreme Command of the Armed Forces (Dec. 12, 1941), *translated in Nazi Conspiracy and Aggression*, 873.

Indeed, "[a]nonymity" and "[i]ntentional de-naming" repeatedly have been used as tools of "de-humanization" and "political repression." Daan Bronkhorst, *Naming Names: Identity and Identification in Human Rights Work*, 16 Netherlands Q. of Human Rights 457, 460 (1998), available at https://perma.cc/X49M-CNVQ (discussing the Turkish genocide and killings in the former Soviet Union). In the tyrannical regimes of history, "[i]ndividuals who once had a name were reduced to a number or were doomed to complete oblivion." *Id.*

Wary of the abuses of power epitomized by anonymizing arrestees, Alexander Hamilton urged the country in the Federalist Papers to eschew secret arrests, writing:

> [T]he practice of arbitrary imprisonments, have been, in all ages, the favorite and most formidable instruments of tyranny. The observations of the judicious Blackstone . . . are well worthy of recital: "To bereave a man of life . . . or by violence to confiscate his estate, without accusation or trial, would be so gross and notorious an act of despotism, as must at once convey the alarm of tyranny throughout the whole nation; but confinement of the person, by secretly hurrying him to jail, where his sufferings are unknown or forgotten, is a less public, a less striking, and therefore *a more dangerous engine* of arbitrary government."

The Federalist No. 84 (Alexander Hamilton) (quoting 1 William Blackstone, Commentaries on the Laws of England 136 (1765)).

Accordingly, governments at all levels in the United States traditionally have ensured that the fact of a person's arrest and custody would not remain hidden. Ever since local police departments were created in the 1800s, they have kept police "blotter[s]"—records that identify "those individuals arrested or formally detained at the station house." Gary D. McAlvey & Gary R. Cooper, *Public Access to Criminal History Record Information,* DOJ Crim. Just. Info. Pol'y, NCJ-111458 (1988), at 2, available at https://hdl.handle.net/2027/mdp.39015025381057. These include each arrestee's physical description, the place and time of the arrest, the name of the arresting officer, the allegations, and, most fundamentally, the arrestee's name. Reporters Committee for Freedom of the Press, *Police Blotter*, available at https://perma.cc/4SR5-4M6P (last visited Oct. 2, 2026); Walter A. Steigleman, *The Legal Problem of the Police Blotter,* 20 Journalism Q. 30, 30 (1943), available at https://perma.cc/BVN6-E8SC. No one doubted the public nature of these records in

the 1800s, and newspapers would often assign reporters to inspect them on a daily basis. Frank Luther Mott, *American Journalism: A History of Newspapers in the United States Through 260 Years: 1690 to 1950*, at 222-23 (N.Y., The MacMillan Co. 1941), available at https://perma.cc/BDR3-CCDP (describing press access to police blotter dating back to 1830s).

Police departments overwhelmingly kept arrest records public throughout the 20th century. In 1966, every newspaper responding to an American Bar Association survey said that reporters in their city were allowed to access police blotters. *Standards Relating to Fair Trial and Free Press: Tentative Draft,* at 241-42, ABA (1966), available at https://perma.cc/8V83-GVRN. In another study, 31 of 33 state attorneys general indicated that policies in their state favored allowing reporters and the public to access blotters on demand. Michael J. Petrick, *The Press, the Police Blotter, and Public Policy,* 46 Journalism Q. 475, 477 (1969), available at https://perma.cc/U422-JKNG.

Sporadic attempts to block public access to arrest logs were repudiated by nearly every court to confront the issue, even in states that did not yet have statutes governing access. In what was apparently the earliest such decision, an Ohio court admonished the Cleveland Police Chief for concealing the city's arrest records from public inspection, holding that this violated the First Amendment. *The Cleveland Co. v. Smith* (Ohio Ct. C.P. July 21, 1920), *reprinted in* Harold L. Cross, *The People's*

*Right to Know* 95 (1953), available at https://perma.cc/48Q8-S98Z. In 1933, a Virginia court similarly prevented police from hiding arrest records on the ground that doing so was "contrary to law and public policy, having regard to the constitutional rights of petitioners and the security and protection of the public and arrested persons." *Times Dispatch Publishing Co. v. Sheppard* (Hustings Ct. of City of Richmond Jan. 13, 1933), *reprinted in The People's Right to Know* 99-100.

The federal government has likewise honored the principle of ensuring public access to arrestee information. In the only 20th-century example of which we are aware of federal officials refusing to disclose the identities of detainees, a district court ruled that FOIA required the United States Attorney to divulge the names of all persons arrested or charged, as well as "background material" that was "traditionally and routinely disseminated to the news media" under federal regulations, including arrestees' ages, employment statuses, and circumstances regarding their arrests. *Tennessean Newspaper, Inc. v. Levi*, 403 F. Supp. 1318, 1319-21 (M.D. Tenn. 1975).

Most jurisdictions—including California,[2] Colorado,[3] Connecticut,[4] the

---

[2] Cal. Gov't Code § 7923.610.

[3] Colo. Rev. Stat. § 24-72-302(7); *id.* § 24-72-303(1).

[4] Conn. Gen. Stat. § 1-215 (formerly § 1-20b).

District of Columbia,[5] Florida,[6] Georgia,[7] Idaho,[8] Indiana,[9] Iowa,[10] Louisiana,[11] Maine,[12] Maryland,[13] Massachusetts,[14] Minnesota,[15] Missouri,[16] New Hampshire,[17] New Jersey,[18] North Carolina,[19] North Dakota,[20] Ohio,[21] Oklahoma,[22] Oregon,[23]

---

[5] D.C. Code § 5-113.06.

[6] Fla. Stat. § 119.011(3)(c).

[7] Ga. Code Ann. § 17-4-27; *id.* § 50-18-72(a)(4).

[8] Idaho Code § 74-124(3)(b).

[9] Ind. Code § 5-14-3-5(a)-(b).

[10] Iowa Code § 22.7(9).

[11] La. Code Crim. Proc. art. 228.

[12] Me. Rev. Stat. Ann. tit. 16, § 708(2).

[13] Md. Code Ann., Crim. Proc. § 10-201(d)(iii).

[14] Mass. Gen. Laws ch. 41, § 98F.

[15] Minn. Stat. § 13.82(2).

[16] Mo. Rev. Stat. § 610.100.2(1).

[17] N.H. Rev. Stat. Ann. § 594:14-a.

[18] N.J. Rev. Stat. 47:1A-3(b).

[19] N.C. Gen. Stat. § 132-1.4(c).

[20] N.D. Cent. Code § 44-04-18.7(2).

[21] Ohio Rev. Code Ann. § 149.43(A)(2)(b); *id.* § 149.435(A)(5).

[22] Okla. Stat. tit. 51 § 24A.8.

[23] Or. Rev. Stat. § 192.345(3) (formerly §192.501(3)).

Pennsylvania,[24] Rhode Island,[25] Utah, Texas,[26] Vermont,[27] and Virginia[28]—have enshrined this tradition of public access to arrest records in statutes that *explicitly* provide that they must be kept available for public inspection on demand and/or are public records subject to disclosure. And even where state public records statutes do not provide that arrest logs are public in their plain language, courts consistently find that they are "not sufficiently investigative in nature to qualify" for investigative records exemptions to public records statutes.[29]

In recommending enactment of such a statute for the District of Columbia, the House Committee on the District of Columbia recognized the "long custom and practice" of public access to arrest records and found that their "availability to the public should be matters of law and not of administrative discretion, both for the protection of the public against secret arrests and to guard against the abuse in any

---

[24] 65 Pa. Stat. § 67.708(b)(16).

[25] R.I. Gen. Laws § 38-2-3.2.

[26] Tex. Gov't Code Ann. § 552.108(c).

[27] Vt. Stat. Ann. tit. 1, § 317(c)(5).

[28] Va. Code Ann. § 2.2-3706(A)(2).

[29] *Hengel v. City of Pine Bluff*, 821 S.W.2d 761, 764-65 (Ark. 1991) (jail log); *State v. Brown*, 467 So.2d 1151 (La. Ct. App. 1985) (arrest log); *Lebanon News Publ'g Co. v. City of Lebanon,* 451 A.2d 266 (Pa. Commw. Ct. 1982) (police blotters); *Sheehan v. City of Binghamton*, 398 N.Y.S.2d 905, 906 (App. Div. 1977) ("police blotters and booking records") (citation omitted); *State ex rel. Outlet Commc'ns, Inc. v. Lancaster Police Dep't*, 38 Ohio St. 3d 324, 328 (1988) (arrest records); *Caledonian Rec. Pub. Co. v. Walton*, 573 A.2d 296, 303 (Vt. 1990); *see also* 63 Op. Att'y General 543 (Md. 1978) (arrest logs).

way of the arrest power." H.R. Rep. No. 83-2332 (1954) (quoted in *United States v. Ross*, 259 F. Supp. 388, 390 (D.D.C. 1966)). The California legislature similarly intended to "continue the common law tradition of contemporaneous disclosure of individualized arrest information in order to prevent secret arrests." *Cnty. of Los Angeles v. Superior Ct.*, 22 Cal. Rptr. 2d 409, 416 (Cal. App. 1993).

It is particularly noteworthy that Illinois, the state in which these arrests were made, has a strong statute guaranteeing public access to arrest information:

> The following chronologically maintained arrest and criminal history information maintained by State or local criminal justice agencies shall be furnished as soon as practical, but in no event later than 72 hours after the arrest . . . (i) information that identifies the individual, including the name, age, address, and photograph, when and if available; (ii) information detailing any charges relating to the arrest; (iii) the time and location of the arrest; (iv) the name of the investigating or arresting law enforcement agency; (v) (blank); and (vi) if the individual is incarcerated, the time and date that the individual was received into, discharged from, or transferred from the arresting agency's custody.

5 Ill. Comp. Stat. Ann. 140/2.15(a). The statute excepts information in items (iii) through (iv) from disclosure in certain circumstances, *id*. § (c), but there are no exceptions for the name and address of the arrestee or the basis for the arrest. Thus, adults arrested in Chicago can have no baseline expectation of privacy *at all* in the fact of their arrest—a reality ignored by the district court.

Underscoring what Illinois and other states already recognized, the Supreme Court held in *Paul v. Davis*, 424 U.S. 693 (1976) that people lack a constitutional

interest in preventing public knowledge of the fact of their arrest. In that case, police distributed to local merchants the name of a person who was arrested for shoplifting. The person claimed that his privacy rights prevented the government from "publiciz[ing] a record of an official act such as an arrest." *Id.* at 713. The Court held that "[n]one of our substantive privacy decisions hold this or anything like this, and we decline to enlarge them in this manner." *Id.*

Following FOIA's passage in 1966 and the addition of subsection 7(C) in 1974, the U.S. Department of Justice made clear that arrestees' identities remain public information. A DOJ regulation first issued in 1975 explicitly provides that confidentiality provisions for criminal records do not cover "[o]riginal records of entry such as police blotters maintained by criminal justice agencies compiled chronologically and required by law or long standing custom to be made public." 28 C.F.R. § 20.20(b)(2). And, ever since 1971, DOJ guidelines have specifically permitted personnel to release the "name, age," and "circumstances immediately surrounding an arrest, including the time and place of arrest" for every person arrested. 28 C.F.R. §§ 50.2(b)(3)(i), (iv).

This Court has allowed the government to conceal detainees' names on just one occasion, for reasons that do not apply here. In *Center for National Security Studies v. DOJ*, 331 F.3d 918 (D.C. Cir. 2003), this Court found that Exception 7(A), which permits the withholding of information that "could reasonably be expected to

interfere with enforcement proceedings," 5 U.S.C. § 552(b)(7)(A), entitled the government to withhold the identities of certain detainees arrested as part of the anti-terrorist investigation in the immediate wake of the 9/11 attacks on the ground that release of their names "would inform terrorists of both the substantive and geographic focus of the investigation" and thereby jeopardize national security. *CNSS*, 331 F.3d at 928. Having found that the government could withhold disclosure under Exemption 7(A), this Court did not determine the applicability of any other exemption. *Id.* at 945 (Tatel, J., dissenting).[30] Thus, it has never used the notion of privacy to conceal arrestees' or detainees' identities under Exemption 7(C). Doing so would sanction secret arrests on a vastly broader and unprecedented scale, as illustrated by the decision below.

In ruling for the Defendants, the district court ignored all of this and applied an inapposite line of cases that does not involve the names of arrested individuals, but rather the mere appearance of individuals' names in law enforcement files. For example, in *Senate of Puerto Rico v. DOJ*, 823 F.2d 574, 588 (D.C. Cir. 1987), Mem. Op. at 3, J.A.49, plaintiffs sought the names of "subjects of a Civil Rights Division investigation, potential defendants in civil rights prosecutions, or witnesses who voluntarily assisted, … as well as the translator at the grand jury proceedings, [and]

---

[30] Apparently recognizing that *CNSS* is not controlling, neither party cited it below, nor did the district court.

several FBI agents." *Schrecker v. DOJ*, 349 F.3d 657, 661 (D.C. Cir. 2003), Mem. Op. at 4, J.A.50, involved informants, witnesses, and investigators. And *Dillon v. DOJ*, 444 F. Supp. 3d 67, 95 (D.D.C. 2020), Mem. Op. at 3, J.A.49, involved investigators and "third parties merely mentioned" in investigatory records.

The disclosures sought in those cases implicated entirely different privacy concerns, including that investigators might become "targets of harass[ment]," *Dillon*, 444 F. Supp. 3d at 99, or that suspected, but not arrested, individuals might suffer "reputational harm," *Senate of Puerto Rico*, 823 F.2d at 588. And because none of those cases were about secret arrests, none involved the grave and overriding public interest in checking abuse of the arrest power.

The expungement or sealing of arrest records in appropriate cases is also consistent with *amicus*'s position. The arrest record is initially and presumptively a matter of public record. A subsequent judicial determination that a particular arrest was unlawful heightens the individual's privacy interest in that record and diminishes the public interest in disclosure because the wrongfulness of the government conduct has already been established and the individual released.

## II. State Courts Consistently Reject Arguments that Personal Privacy Permits Law Enforcement Agencies to Conceal the Identities of People in Custody

State courts widely recognize that exemptions for individual privacy in public records laws must be read "narrowly." *See, e.g.*, *Practical Political Consulting v.*

*Sec'y of State*, 287 Mich. App. 434, 464-65 (2010) ("In all but a limited number of circumstances, the public's interest in governmental accountability prevails over an individual's, or a group of individuals', expectation of privacy."). Accordingly, state courts resoundingly agree that such exemptions do not permit law enforcement agencies to conceal the identities of people they have arrested. *See* Reporters Committee for Freedom of the Press, *Arrest Record*, available at https://perma.cc/N796-URWP (last visited Oct. 2, 2026) (showing that arrest records are either accessible by public inspection laws or required to be disclosed by public records laws in the vast majority of states, including by state court rulings).

Texas courts provide one example. When the City of Houston refused a media request for certain arrest records, the Court of Civil Appeals rejected the argument that the newly enacted Texas Open Records Act protected those records from disclosure. *Houston Chron. Publ'g Co. v. City of Houston*, 531 S.W.2d 177, 188 (Tex. Civ. App. 1975). Informed by custom and constitutional considerations, the Court held that the act required public disclosure of an arrestee's "name, alias, race, sex, age, occupation, address, 'I.D.' number," "physical condition," and other information. *Id.* at 180. Highlighting the illogicality of the City's position, the Court noted that media representatives were, "[n]ot surprisingly, . . . shocked to discover that legislation that was declared to be for the purpose of opening up to public

scrutiny functions of government was being construed to deny access to reports previously available to the press." *Id.* at 181.

A Hawaii appellate court approvingly cited a formal opinion letter from the state Office of Information Practices to the same effect:

> [A]s our research discloses, most authorities agree that because 'secret arrests' are illegal under our form of government, an arrest is a public, not a private event. As such, arrested individuals have neither a significant nor a constitutional privacy interest in the circumstances surrounding their arrest. Because there is substantially more than a 'scintilla' of public interest in the disclosure of police blotter data . . . their disclosure would not constitute 'a clearly unwarranted invasion of personal privacy' under the [Hawaii public records statute].

*Mott v. City & Cnty. of Honolulu*, 146 Haw. 210, 217 (Ct. App. 2020) (first alteration in original) (quoting OIP Op. Ltr. No. 91-4, 1991 WL 474701, at *1 (Mar. 25, 1991)).

Wisconsin has taken the same view. In *Newspapers, Inc. v. Breier*, the Wisconsin Supreme Court considered whether the Milwaukee Police violated the state public inspection law by refusing to disclose the charges on which particular persons were arrested. 89 Wis. 2d 417, 420-21 (1979). The Court rejected the argument that arrestees' privacy required withholding the charges, finding that the statute, which it viewed as "a statement of the common law," required police to make basic arrest information, including names and charges, "open for inspection." *Id.* at 424, 426. Heeding the U.S. Supreme Court's holding that there is no constitutional privacy interest in the fact of an arrest, *id.* at 430 (citing *Paul v. Davis*, 424 U.S. 693 (1976)), and noting that "the public interest in open public records weighs heavily

in every case," *id.* at 433 (citation omitted), the Court held that "possible damage to arrested persons' reputations does not outweigh the public interest," *id.* at 440.

In that case, the Police Chief did not contend that he could conceal the names of arrested individuals. *Id.* at 428. But the Court noted that, had he done so, a "serious constitutional due-process question . . . would be posed by secret arrests." *Id.*

## III. Disclosure of Arrest Information Serves Functions Indispensable to Our Democracy

ICE's unwillingness to disclose the names of the individuals arrested during its January 2025 Chicago raids is part of the agency's larger effort to shroud its entire deportation effort in "extraordinary secrecy."[31] ICE agents often descend upon communities after midnight, driving unmarked vans, wearing plain clothes and masks, and refusing to identify themselves.[32] ICE rarely, if ever, notifies families that it has arrested their relatives or where they are being taken,[33] meaning that

---

[31] Pranav Baskar & Hamed Aleaziz, *U.S. Deports Nine Migrants in Secret, Ignoring Legal Protections*, N.Y. Times (Feb. 16, 2026), https://perma.cc/AVZ8-FHKS.

[32] *18 Chicago Residents Brutalized by Federal Agents During a Military-Style Immigration Raid File Legal Claims Seeking Accountability and Justice*, Nat'l Immigrant Just. Ctr. Press Release (May 13, 2026), https://perma.cc/YVW6-W4ZN; Allie Preston, *Masked and Unidentifiable: The Risks of Federal Law Enforcement Operating Without Identification*, Ctr. for Am. Progress (Aug. 28, 2025), https://perma.cc/FSQ9-VBAF; *Urquilla-Ramos v. Trump*, 821 F. Supp. 3d 603, 632 (S.D.W. Va. 2026) ("A regime of secret policing has no place in our society.").

[33] Diana Flores, *How ICE's detention system makes people untraceable*, Am. Friends Service Committee (Dec. 30, 2025), https://perma.cc/WWQ6-QJL4 ("The average time to locate a missing loved one was three to five days from the moment of

families may not know for days what happened to their loved ones.[34] By the time families and counsel even learn of the arrest, arrestees often have been transferred to distant ICE detention centers.[35]

After an initial transfer, subsequent "rapid transfers can leave people unreachable for hours or even days,"[36] as even the agency struggles to keep track of them.[37] People are herded onto planes without being told their destination or given an opportunity to inform their families or their lawyers that they are being transferred or deported.[38] Detainees have been outright blocked from communicating with

---

arrest"); *New ACLU Report Documents Widespread and Unchecked Civil Rights Abuses by Immigration Agents in President Trump's Second Term*, ACLU Press Release (July 16, 2026), https://perma.cc/7RMG-3KQN.

[34] Flores, *supra* note 33 (describing that in cases handled by American Friends Service Committee, no families received official notice "from any federal agency about where relatives had been taken").

[35] *ICE Detained Them, and Then They Vanished*, The Marshall Project (June 1, 2026), https://perma.cc/HN86-ZC9H (describing that 41,700 people were transferred out-of-state within 24 hours in 2025).

[36] *Id.*

[37] *Advocs. for Hum. Rts. v. U.S. Dep't of Homeland Sec.*, 825 F. Supp. 3d 858, 870 (D. Minn. 2026) (ICE "transfer[s] people so quickly that even [the agency] struggle[s] to locate detainees").

[38] Aditi Shah, *Without Access to Counsel, Detained Immigrants Face Increased Risks of Prolonged Detention and Unlawful Deportation*, ACLU (June 22, 2022), https://perma.cc/3QCU-QQ3X.

lawyers[39] and journalists[40] or held in solitary confinement.[41] Later, ICE flouts the public's statutory right to attend some immigration proceedings.[42] As the district court in this case correctly noted, it is not safe to "assume[]" that anyone "could successfully contact these individuals" in ICE custody at any given time. Mem. Op. at 6, J.A.52.

Like much of ICE's activities, little is known about the Chicago raids that spanned the first ten days of President Trump's second administration. "[B]order czar" Tom Homan promised in the days leading up to the 2025 Inauguration that Chicago would be "ground zero" for ICE raids[43] and dubbed planned activities in

---

[39] Aditi Shah & Eunice Hyunhye Cho, *No Fighting Chance: ICE's Denial of Access to Counsel in U.S. Immigration Detention Centers*, ACLU (2022), https://perma.cc/34RG-HR6C; *Advocs. for Hum. Rts.*, 825 F. Supp. 3d at 874, 894 (granting a preliminary injunction to a class of detainees whom ICE entirely barred from contacting counsel, making their representation "literally impossible").

[40] Christine Fernando, *'Inhumane' conditions at Chicago-area ICE facility, advocates allege in new lawsuit*, PBS News (Oct. 31, 2025), https://perma.cc/2E2B-54SW.

[41] Rachel Reed, *ICE used solitary confinement more than 14,000 times in the past five years, report reveals*, Harvard L. Today (Feb. 6, 2024), https://perma.cc/R7FW-4LKB.

[42] *Advocs. for Hum. Rts. v. Blanche*, No. 1-26-cv-00865 (RC), 2026 WL 2607203, at *1, *24 (D.D.C. Sep. 3, 2026) (denying the Government's motion to dismiss and finding that "Plaintiffs plausibly allege that the Government is denying volunteer observers access to immigration proceedings by either holding them entirely online with no way for the public to access them or providing access only in a different state with no adequate notice of where that will be").

[43] Suzanne Le Mignot, *Chicago police craft stance of Trump's mass deportation policy*, CBS News (Jan. 14, 2025), https://perma.cc/BKF6-USN4.

the city "Operation Safeguard."[44] During the raids, up to two hundred federal agents swarmed Chicago.[45] Almost two years later, the public still does not know who was arrested, where they are being held (or whether they have been deported), and whether their arrests and detentions complied with legal safeguards. Thus, the release of arrestees' identities would serve functions of the highest order in our democracy.

**1. Protection of arrestees**

First, disclosure of arrestees' identities would allow the public to know who ICE has taken and where they are detained—information necessary to understand the "nature and purpose of the Chicago-area raids." Mem. Op. at 5, J.A.51. As the Plaintiffs have explained, it is exceedingly difficult, if not impossible, for journalists and other interested persons to contact ICE detainees without knowing their names. Pl.'s Mot. for Summ. J. 11-13, ECF 18. People searching for a detainee can use ICE's Online Detainee Locator System or contact ICE directly to find out whether a person has been deported or where they are being held, but either method requires knowing

---

[44] Zolan Kanno-Youngs & Hamed Aleaziz, *Trump's Deportation Plan Could Start Next Week in Chicago*, N.Y. Times (Jan. 18, 2025), https://perma.cc/K7AR-84X6.

[45] *Trump's first immigration raid to target 300 people in Chicago on Tuesday*, The Guardian (Jan. 18, 2025), https://perma.cc/UKW2-N7VY.

who they are searching for.[46] Disclosure would thus assist journalists and public interest groups to learn and inform the public about whether these individuals have been unlawfully arrested, held in unsafe conditions, or blocked from accessing counsel. Obstructing such efforts is precisely how secrecy can insulate abuses of government power.

Secret arrests harm *detainees* by "exposing them to the risk that none will learn of their arrest, scrutinize the conduct of the police and judges who deal with them, or keep alive the just public concern with the conditions of their incarceration." James Russell Wiggins, *Secret Criminal Justice*, *in* James Russell Wiggins Collection 3 (1975), available at https://perma.cc/ZY7F-6VTT. And "[t]hese are all *public* matters that involve all of society which is interested in seeing that justice is done and injustice is not countenanced." *Id.* (emphasis added).

There is compelling evidence that by concealing the identities of detainees, ICE veils civil rights violations, including the illegal arrest of U.S. citizens. The Senate Permanent Subcommittee on Investigations documented ICE's arrest of 22

---

[46] *See* U.S. Immigration and Customs Enforcement, *Detention Facilities*, https://www.ice.gov/detention-facilities (last accessed Oct. 2, 2026) (the "Contacting a Detainee" section for each facility provides that information about detainees can be obtained by contacting the facility where they are held and providing their biographical information); U.S. Immigration and Customs Enforcement, *Online Detainee Locator System*, https://locator.ice.gov/odls/#/search (last accessed Oct. 2, 2026) (ICE's Online Detainee Locator System requires people searching for a detainee to input their name, unless they know their Alien Registration Number, which is not publicly available).

citizens between June and November 2025, including a disabled veteran who was pepper-sprayed, tear-gassed, forcibly dragged from his vehicle, and held for days with little clothing and no medical treatment before being released without charges. *Unchecked Authority: Examining the Trump Administration's Extrajudicial Immigration Detentions of U.S. Citizens*, U.S. Senate Permanent Subcommittee on Investigations (2025), at 2, 13, 46-48, available at https://perma.cc/VN5G-572C. An ACLU report identified 155 U.S. citizens who "were detained, were targeted for enforcement, or experienced law enforcement misconduct" by ICE during 2025. Denise C. Bell & Naureen Shah, *Agents of Chaos and Cruelty*, ACLU (2026), at 5, available at https://perma.cc/VNW7-UFBX. Meanwhile, ICE insists that it has detained "no American citizens." Adrian Florido, *NPR fact checks Kristi Noem on ICE detaining US citizens*, NPR: All Things Considered (Nov. 5, 2025), available at https://perma.cc/J3T3-A4WE.

The district court erroneously thought that because detainee information cannot be used to conclusively establish "*non-citizenship*," "the requested information has, at best, limited probative force." Mem. Op. at 6, J.A.52. (emphasis added). This conclusion entirely ignores that detainee information *can* be used to conclusively establish *citizenship* in some cases—the exact information that, if it exists, would reveal grave civil rights violations and be of the utmost public concern. It is vital that people be able to cross-reference detainees' names with voting records

and other public information to identify citizens as well as possible, even if that effort fails to identify some.

The district court thought that "[t]he incremental value of interviews is even more speculative" than cross-referencing public records because even if interviews could reveal whether detainees have criminal records, that information "is neither necessary nor sufficient to establish that [they were] unlawfully arrested or detained." Mem. Op. at 6, J.A.52. That may be true, but it misses the point. The public benefit of journalists' contact with detainees extends far beyond knowing whether their arrests were illegal; it includes, for example, journalists' ability to uncover the personal histories—good or bad—of the people that ICE is arresting in droves.

**2. Deterrence of government misconduct**

The second democratic function of disclosure follows naturally from the first. If the government knows that arrests will be scrutinized, it will be deterred from using its arrest power improperly—whether to punish dissent, to serve political goals, or simply arbitrarily. Inversely, if it knows that the nature of its arrests may never come to light, it may abuse that power. As a senior editor at the Washington Post explained long ago:

> The police, knowing that each arrest must be [publicly] recorded, and may have to be explained are less likely to use arrest powers frivolously. … The entry in the arrest book, to which all citizens has [sic] access, is assurance that a man's disappearance into jail will not go un-noted.

James Russell Wiggins, *Remarks to the Maine Press Association*, *in* James Russell Wiggins Collection 11-12 (1974), available at https://perma.cc/8SBF-LWBK. This accountability function is in line with the fundamental logic of FOIA that public access to government records can not only unveil but also prevent misconduct. *N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978) (FOIA is a "check against corruption").

**3. Democratic self-governance**

Third, information about police activity is indispensable to effective participation in our democracy. Disclosure of arrest records would enable the public to challenge false representations by ICE and enable voters to determine whether their tax dollars are well- (or even lawfully) spent. Americans have expressed serious doubts on this score; nearly two-thirds think that "ICE has gone too far in [its] immigration crackdown."[47] Meanwhile, Congress has appropriated unprecedented multi-year funding to ICE and Customs and Border Protection, approving a $70B injection to be used before September 2029, on top of soaring annual allocations that are projected to push total enforcement spending past $200B by FY 2027.[48]

---

[47] Matt Loffman, *Poll: Nearly two-thirds of Americans say ICE has gone too far in immigration crackdown*, PBS News (Feb. 5, 2026), https://perma.cc/634K-HNJ9.

[48] Margy O'Herron*, ICE and Customs and Border Protection Budgets to Exceed $200 Billion*, Brennan Ctr. for Just. (June 25, 2026), https://perma.cc/L2TE-WH7V.

Voters have a right to understand the nature of such significant spending. ICE states that it prioritizes enforcement directed at people with serious criminal records (the "worst of the worst") while going after "no" U.S. citizens. But numerous investigations contradict the agency's statements in spectacular fashion. The public needs to know whether or not ICE's deportation machinery works the way it claims so they can press their representatives for reform and cast informed votes. As James Madison put it: "A popular Government without popular information or the means of acquiring it, is but a prologue to a Farce or a Tragedy; or perhaps both." James Madison, Letter to W.T. Barry (Aug. 4, 1822), *reprinted by* Nat'l Archives: Founders Online, available at https://perma.cc/59AL-6PGB.

The district court recognized that "[t]here is certainly a public interest in evaluating the veracity of Defendants' representations about the nature and purpose of Chicago-area raids." Mem. Op. at 5, J.A.51. This includes knowing whether ICE operations targeted individuals with criminal records, as it has repeatedly insisted, or swept far more broadly. The court seemed to doubt, however, that organizations could use arrestees' identities to determine whether ICE's raids targeted individuals with criminal records. *Id.* at 6-7. But this exact reporting is being done for other raids

by organizations like the American Immigration Council[49] and Deportation Data.[50] Their work—based on information obtained through FOIA—directly serves FOIA's core focus of keeping citizens apprised of "what their Government is up to," which the Supreme Court has made clear is not "a convenient formalism" but "a structural necessity in a real democracy." *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 171-172 (2004) (cleaned up).

* * *

Each of these public functions of disclosure highlights that secret arrests are an inherently public problem. International human rights bodies have emphasized that by "prevent[ing] monitoring by national preventive mechanisms and other competent bodies," secret arrests create "a wound that corrodes the fabric of society." *Enforced disappearance inflicts profound suffering on victims and violates their right not to be subjected to torture and other cruel, inhuman or degrading treatment*, Council of Eur. Comm'r for Hum. Rts. (Aug. 29, 2025),

[49] *Immigration Detention Expansion in Trump's Second Term*, Am. Immigr. Council (Jan. 14, 2026), at 13, https://perma.cc/8WRK-9DWD (tracking the number of average daily ICE arrests between October 2024 and October 2025 of individuals with a prior conviction, pending criminal charges, and no criminal record).

[50] Graeme Blair & David Hausman, *Immigration Enforcement in the First Nine Month of the Second Trump Administration*, Deportation Data Project (Jan. 27, 2026), at 5, https://perma.cc/65AH-ZDML (tracking the number of arrests of noncitizens with no convictions, convictions for a nonviolent crime, and convictions for a violent crime between July 2024 and October 2025).

https://perma.cc/N4HP-ZR72. Tyrannical governments use secrecy "as a deliberate strategy of control through terror intended to cause suffering, instill fear, suppress dissent, and punish entire communities," not only those individuals held in detention. *Id.* As a poison that infects the entire body politic, the antidote to secret arrests must be public knowledge and accountability.

To facilitate public scrutiny of the arrest power, all levels of government have for centuries allowed the public to access the identities of the people in custody. When they have wavered, courts have interceded to explain that disclosure is not discretionary but compelled by the rule of law. This "open system of criminal justice that protects [Americans] against secret arrest" is a "priceless heritage." Wiggins, *Secret Criminal Justice*, *supra*, at 1. Now, ICE asks this Court to expand Exemption 7(C) to facilitate the secret arrest and detention of individuals who have not even been charged with a crime, as to many of whom there has been no judicial finding of probable cause, and who are not guaranteed the Sixth Amendment rights to counsel and a speedy trial by jury. This Court should decline that invitation.

## CONCLUSION

For the reasons given above and in the brief of the Appellee, the judgment of the district court should be reversed and the case remanded with instructions to enter judgment for the Plaintiff.

October 5, 2026

Respectfully submitted,

/s/ *Arthur B. Spitzer*
Arthur B. Spitzer
Lauren Pelosi*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 420
Washington, DC 20045
202-457-0800
aspitzer@acludc.org
lpelosi@acludc.org

*Counsel for Amicus Curiae***

* Ms. Pelosi is not yet admitted to the bar. She is practicing under the supervision of attorneys at the American Civil Liberties Union Foundation of the District of Columbia.

** Counsel wish to acknowledge the assistance of paralegal Ameerah Adetoro in the preparation of this brief.

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the length limitations of Fed. R. App. P. 29(a)(5) because it contains 6,436 words, excluding the parts of the brief exempted by Circuit Rule 32(e)(1).

I certify that the foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

October 5, 2026

/s/ *Arthur B. Spitzer*
Arthur B. Spitzer
*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I certify that on October 5, 2026, I caused copies of the foregoing Brief of the American Civil Liberties Union as *Amicus Curiae* to be served on all counsel of record via the Court's ECF filing system.

October 5, 2026

/s/ *Arthur B. Spitzer*
Arthur B. Spitzer
*Counsel for Amicus Curiae*